DESCHUTES COUNTY ASSESSOR,
*Plaintiff,*
*and*
DEPARTMENT OF REVENUE,
*Intervenor-Plaintiff,*
*v.*
BROKEN TOP CLUB, LLC,
*Defendant.*
(TC 4391)

Trial was held March 14, 15, and 16, 2000, in the Deschutes County Board of Commissioner's Hearing Room, Bend.

Mark P. Amberg, Deschutes County Legal Counsel, Bend, argued the cause for Plaintiff (the county).

James C. Wallace, Assistant Attorney General, Department of Justice, Salem, filed a Complaint in intervention for Intervenor-Plaintiff (the department), but did not appear at trial.

Neil R. Bryant, Bryant, Lovlien & Jarvis, Bend, argued the cause for Defendant (taxpayer).

Decision for Plaintiff rendered October 16, 2000.

**CARL N. BYERS, Judge.**

Plaintiff Deschutes County Assessor (the county) appeals from a Decision reducing the assessed value of Defendant Broken Top Club's, LLC (taxpayer) golf course for the 1997-98 tax year. The county claims that the unencumbered value of the property is much higher than that determined by the magistrate. Taxpayer defended, and a trial was held in Bend.

FACTS

The subject property is a high-quality 18-hole golf course approximately three miles from downtown Bend. The subject property contains 200.65 acres and is part of a larger planned real estate development of some 500 acres. The golf course is a 7,161-yard 72-par course designed by Tom Weiskopf and Jay Morrish. It is surrounded by 500 residential home sites, each with a minimum 100-foot frontage. The golf course is irrigated by a computerized Rainbird irrigation system. Its view of the mountains, lakes, trees, and sky provide an extraordinary setting. There are five lakes in the subdivision. The largest lake, six acres in size, is next to the clubhouse and stocked with trout for fly fishing. The golf course also has a practice green and a putting course. A small lakehouse contains a water-pumping system and snack shop. There is also a maintenance building and two sets of restrooms on the golf course.

The clubhouse of approximately 26,243 square feet (3,575 square feet are unfinished) makes extensive use of wood beams and stone and is of high quality. The clubhouse contains men's and women's lockers; cart storage; a pro shop; swimming pools, spas, and hot tubs; a great room; both a public and a private restaurant; an exercise room; a board room; and administrative offices. One of taxpayer's appraisers states that:

"The subject property is in a very unique location in Bend. The general area is considered one of the premier golf course and resort locations in the [*sic*] Oregon."

The golf course, its amenities, and the associated real estate development were conceived as a single project. The project is designed to be exclusive and of the highest quality, looking to attract the top 5 percent of the golfing market. Its exclusivity is marked by the private gated community and limiting the golf memberships to owners of lots in the subdivision.

The golf course and the first phase of the real estate development, containing 130 lots, was developed in 1992-93. The second phase added 50 lots in 1993-94 and saw the completion of the club house in 1994. The third phase added 70 lots in 1994-95. Overall, the developer expected to sell approximately 600 residential lots and all 395 golf memberships by 1999. However, competition from other courses and changes in the local and national economy defeated this objective. By 1997, only 111 golf memberships had been sold. In addition, sales of the real estate lots had slowed significantly.

As a result, the golf course and clubhouse experienced significant net-operating losses. Some of the investors wanted out. The entire project was owned by a limited partnership of two corporations owning 51 percent and 49 percent respectively. Those groups also owned an adjacent 1,200 acres in a separate partnership intended for future real estate development. The partnership also included an interest in Skyliner Summit Limited Partnership.

On July 10, 1997, an outside investor, Joe Weston, purchased 32.3 percent of the stock of Broken Top, Inc., for $4.193 million. The following day, Broken Top Limited Partnership sold the golf course to Broken Top Club, LLC, and sold the real estate development to a separate Broken Top Development, LLC. That two-step transaction was designed to avoid having to first offer the subject property to the members. Although golf-course memberships are not equity memberships (*i.e.*, no ownership interest in the property), they have a first right of refusal if the club is offered for sale to a nonaffiliate. The transaction was structured in two steps in

order to make Weston an affiliate, and therefore the club did not have to be offered first to its members.

*Appraisal Evidence*

The county's appraisal witness, Martin Benson, is experienced in appraising golf courses. He is a coauthor of a book entitled *Golf Courses and Country Clubs: A Guide to Appraisal and Market Analysis* published by the Appraisal Institute in 1992. He is also the author of two articles on appraising golf courses in an appraisal journal. Benson's appraisal relied primarily upon the discounted cash-flow analysis. However, his appraisal differed from the taxpayer's two appraisers on two important points. First, he valued the property as a fee simple estate, concentrating on the real property and not as a going concern and not encumbered by membership rights and policies. Second, believing that the policy of restricting membership to lot owners has the effect of holding down the golf course's value, he projected net income based upon an open membership. Benson indicated that he would reduce the entry fee from $25,000 to $15,000 and open the membership to anyone who wanted to join on that basis. Also, he concluded that an owner would sell 425 memberships instead of 395. Based on his projections, the club would reduce its expenses and increase its memberships. In short, Benson thought that taxpayer was too exclusive for the Bend market. In his opinion, ratcheting down exclusivity by one notch would result in more members and greater value. With those changes, Benson believes that golf-course memberships would sellout in five years. Therefore, his discounted cash flow is based on a positive net cash flow every year for five years. Applying a discount factor of 12.5 percent, he determined that the indicated value of the subject property by the income approach was $9,500,000.

Benson also used a sales-comparison approach, comparing the subject property with five other golf courses which had sold. None of his comparable sales was in the Bend area. After adjustments, the comparables sales indicated a range of $9,359,250 to $9,978,100. He concluded that those indicated a stable-value conclusion of $9.4 million. Benson testified that he also considered the cost approach, although not in great detail. In that regard, the general cost appeared to be

$12.2 million, with approximately $4,859,356 spent constructing the clubhouse, tennis courts, swimming pools, and other improvements, and $4,664,068 being used to construct the golf course (exclusive of land cost). Benson's reconciled value for the real property, exclusive of personal property not included in this appeal, was $8.7 million.

Taxpayer had two appraisers. Steven Zenker estimated the "fee simple interest of the going concern value July 1, 1997." In an addendum to his appraisal report, Zenker clarified that he was valuing the "fee simple estate of the going concern *subject to rights of membership*." (Emphasis added.) Zenker also relied upon the income approach and the sales-comparison approach. In the income approach, he performed a discounted cash-flow analysis projecting the net cash flow for ten years with an eleventh-year reversion. However, he apparently assumed the ten-year period started in 1998 and ran through the year 2007.

Zenker also performed a sales-comparison approach using five sales, only one of which is the same sale used by Benson. Three of the five sales involved significantly inferior courses and were "somewhat distressed" sales ranging in value from $332,316 to $416,667 per hole. The other two courses were more similar to the subject and ranged in value from $558,111 to $520,833 per hole. Zenker estimated that the subject property should have a market value of $450,000 to $500,000 per hole, assuming stabilized operation. However, he indicated that with only 24 percent of the subject memberships sold, in his judgment, he would discount the indicated value by 50 percent. Acknowledging that this was a subjective judgment, his 50 percent discount results in a price per hole of $225,000 to $250,000, or $4.1 million to $4.5 million for the subject golf course.

Lawrence Ofner, another appraiser, also testified for taxpayer. He valued the subject property in "fee simple, as a going concern golf course operation, subject to the memberships and operating policies of the Broken Top Golf Club."[1] Ofner considered the cost approach but did not use it because

---

[1] That description contains concepts that, when combined, constitute a legal oxymoron.

the owner reported the cost to be $12 million, exclusive of land costs. He concluded that his discounted cash-flow analysis revealed substantial economic obsolescence. He also believes that the market value of golf courses is typically much less than their development costs. Ofner considered the sales-comparison approach but did not find any sales in a similar early stage of absorption. He considered the sale of the subject in July 1997 but concluded that based on his analysis, those transactions would indicate a "somewhat below market" value.

Ofner constructed a discounted cash-flow income approach, incorporating the first three years of actual experience of the subject property. He then projected the complete sellout of memberships in eight years. Based on those projections, with some exceptions such as pro-shop income, he concluded that the subject property would have a market value of $2,400,000.

## ANALYSIS

Beginning with the 1997-98 tax year, property in Oregon was to be assessed at either its real market value or its maximum assessed value, whichever was less. The issue in this case is the real market value of the subject property. Real market value is defined in ORS 308.205(1)[2] as:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."

■ It has long been the rule in Oregon that what is being valued is the fee simple estate. By statute, that value is assessed to the person holding title. Therefore:

> "In fixing the true cash value of land for property tax purposes the effect of existing leases on the value to the owner is disregarded. The basis for such a principle is that the tax is levied upon the land and is a tax upon all the interests into which the land might be divided. Admittedly, a lease might decrease the price which the owner might receive;

---

[2] All reference to the Oregon Revised Statutes are to 1997.

however, the tax is not merely upon the owner's interest; the tax is upon all the interests in the land, including the leasehold interest." *Swan Lake Mldg. Co. v. Dept. of Rev.*, 257 Or 622, 625, 478 P 2d 393 (1971).

Both of taxpayer's appraisers valued the property as a "going concern." The use of that term introduces a degree of confusion or uncertainty as to what is being valued. An accepted definition of that term is as follows:

> *"Going-concern value is the value of a proven property operation.* It includes the incremental value associated with the business concern, which is distinct from the value of the real estate. * * * Going-concern value refers to the total value of a property, including both real property and intangible personal property attributed to business value." Appraisal Institute, *The Appraisal of Real Estate*, 26 (11th ed 1996).

■ The above does *not* describe what is taxable in Oregon. Oregon property tax statutes generally do not impose a tax on business or going-concern value, only on tangible real and personal property. Unless specifically made so, intangible personal property is not taxable. ORS 307.030. Taxable property value does include value attributable to the assembly of the parts into a unified or working whole. That "assemblage value" is identified with the functioning of the property but not with who or how the property is operated. *Boise Cascade Corp. v. Dept. of Rev.*, 12 OTR 263, 268-69 (1992).

All of the appraisers agree that the highest and best use of the subject property is as a golf course with clubhouse. The assemblage value is inherent in those improvements, *i.e.*, a clubhouse of appropriate size and quality for this particular kind of course and location.[3] Consequently, the appraisers are generally in agreement regarding the assemblage of this property.

However, the appraisers do not agree upon the best method of operating the property. The property could be operated under one-of-three approaches: (1) as a high-end

---

[3] Although the manager Ron Delaney testified that the clubhouse might not be as functionally efficient as it could be, in general, it is appropriate for this quality of a course in this location.

daily fee course open to the public; (2) as a high-quality open-membership course, open to anyone with sufficient money to join; and (3) as an exclusive private golf course, limited to people owning lots in the Broken Top subdivision. The question that each appraiser must face is: which alternative produces the greatest value? Benson concluded that the current approach as an exclusive private club limited to owners of lots in the Broken Top subdivision has a negative influence on value. Zenker and Ofner disagree.

The court finds it significant that operation of the course has been related to the development of surrounding real estate. Zenker states: "The subject golf course is operated to enhance the overall value of the development."

Ofner appears on target in recognizing that the golf course would not likely be developed except for the residential development adjacent to it.

"* * * Absent any such residential development surrounding it, it is unlikely the subject golf course could have been feasible or would have been developed, except possibly as a daily fee course. However, considering the subject's actual status, as restricted by the MOP [membership operating policies], its highest and best use would be limited to a private golf club operation as an amenity serving the Broken Top development.

"* * * Such courses are developed to provide an amenity to the surrounding residential properties as a means for obtaining lot price premiums and faster lot absorption."

Thus, each party has its own perspective. Taxpayer views the subject golf course as an attractive part of its residential development and accepts that it will have less value in its early years. On the other hand, the county views the property as a stand-alone project entitled to be valued without being restricted to what is best for the surrounding lot sales.

How the relationship of the subject property to the real estate development is viewed impacts three separate aspects of value. First, if the golf course is viewed as a stand-alone project, the risk is undoubtedly higher than if blended

with the residential development. It is the real estate developer who receives the approximately 60 percent premium for lots on the *golf course*, not the *golf course owner*. The evidence that Weston would not have purchased an interest in the golf course without also obtaining an interest in the real estate development bears on this issue.

Second, if the golf course is viewed on a stand-alone basis, it is appropriate to project income and expenses accordingly, based on its highest and best use (*e.g.*, whether exclusive, private club or one more open to the public). On the other hand, if it is associated with the real estate development, it would be appropriate to use actual income and expenses, which reflect the influence of the development. The evidence indicated that the lot sales were not as rapid as anticipated and consequently the golf membership sales were not as rapid as anticipated.

Third, if the golf course is valued as unrelated to the value of the real estate development, the interests of those lot owners who hold golf memberships is of little or no concern. However, if the two properties are related, the attitude of lot owners who hold golf memberships are of significant concern.

■       As of the assessment date in question, golf memberships had been sold. Taxpayer therefore reasons that those memberships are obligations that encumber the property and thereby reduce its value. However, as *Swan Lake Mldg.* makes clear, those are encumbrances upon the owner's rights, not upon the property. 257 Or at 625. Benson is correct that the sale of memberships is like prepaid rent for future use of the property. It does not reduce the value of the property; it only reduces the value of the owner's interest in the property. With that understanding of what is subject to assessment and taxation, the court will consider the evidence of value.

Taxpayer contends that the sale of the subject in July 1997 constitutes good evidence of its market value. The subject property sold on July 11, 1997, for $3,516,148.98 from the Broken Top Limited Partnership to the Broken Top Club, LLC. The sale involved a number of parties and entities with complex relationships. A detailed explanation of the transaction would extend this Opinion without additional benefit.

The abbreviated explanation is: On July 10, 1997, Weston bought out a group of investors for $4.193 million, giving Weston an indirect 16.5 percent interest in the golf course and the real estate development. On July 11, 1997, the golf course and real estate development were sold separately, at the conclusion of which Weston owned 37.9 percent of the golf course and 51 percent of the real estate development. No information or evidence was provided regarding the sale of the real estate development, and the court is unable to evaluate whether the price paid for the golf course was affected by the price paid for the real estate development.

Ofner's appraisal report indicates that of the $3,516,148.98 sale price for the golf course, only $1,165,000 was in cash. The rest was in assumed liabilities, the largest of which was $2,210,625 for membership deposits that are repayable after 30 years. He recognizes that the present value of that obligation was only about $50,000 to $90,000.[4] Consequently, the real price of the property was more like $1,355,000. Further, the sale included the real estate sales office, which is not part of the property under appeal in this case. If the value of the real estate sales office, which the magistrate determined to be $700,000, is deducted from the sales price, that leaves only $655,000 for the golf course and clubhouse. Those figures suggest that if the subject property was offered first to the 111 golf members, they could have purchased the entire golf course and clubhouse for $5,900 each. In perspective, the court concludes that the sale of the property in July 1997 is not a valid indication of the real market value of the property.

In summary, for purposes of property taxation, the law assumes a willing buyer and a willing seller. Where the subject property may have more than one owner or parties of interest, the law assumes that all interested parties are willing to sell. In the context of this case, that means that if those holding golf memberships are viewed as having an interest in the subject property, they are assumed to be willing sellers. Further, the sale of the subject property was not an open-market transaction. From all the circumstances, it was more

---

[4] Ofner estimates a range of $50,000 plus or minus and on page 37 of that same exhibit, he calculates an amount of $90,000.

like a rescue operation of the real estate development with its associated golf course. Otherwise, why not offer the golf course for sale to its members? Because the transaction was structured to avoid that very situation, one might infer that the price was so low the members would buy the course and the real estate development would lose an attractive inducement.

As did all three appraisers, the court finds that the most reliable indication of value is the income approach. All three appraisers gave it the greatest weight. Taxpayer's appraisers erred in assuming that the property continues subject to the members' operating policies. The property is entitled to be valued as more than an amenity to help sell lots.

The court finds that the preponderance of evidence supports Benson's view that an open membership would result in increased members and increased revenues. The two competing golf courses closest to the subject, Awbrey Glen and Crosswater, are both open to public membership. Awbrey Glen started about the same time as the subject but has a lower membership fee. By 1997, it had almost twice the number of members. Crosswater also started about the same time with the same $25,000 membership fee. By 1997, it had over twice as many members as the subject. Undoubtedly, there are many explanations and reasons for that, but the evidence indicates that limiting course memberships to those who own property in the Broken Top real estate development has slowed memberships in Broken Top Golf Club.

Gary Finicle testified that taxpayer had considered an open membership but concluded that it would hurt lot sales. He indicated that he believed people would pay premiums for lots on a private course versus an open-membership course. Likewise, Kay Cushman testified that Broken Top receives about a 66 percent greater price for fairway lots while Awbrey Glen receives only 29 percent. Some portion of that lot premium is attributed to the exclusivity of golf memberships.

Although there was evidence that the owners had tried to attract members from California and other areas, the primary market for users of the subject property is the Bend

area. In view of the number of competing golf courses, the population, and economy, the court agrees with Benson that a $15,000 entry fee would be more appropriate than a $25,000 fee. Although the subject is of extremely high quality, the market economics as of 1997 were such that a lower fee would attract more members. For example, Bend Golf and Country Club, an established course of high quality, reduced its entry fee in 1997 to attract more members. The court also agrees with Benson that limiting the membership to 395 members is unnecessary. Both Awbrey Glen and Crosswater have membership limits of 450. Benson's estimate of 425 would be very reasonable. That number impacts both the joining fees and the monthly dues income.

For the above reasons, the court can give little weight to the opinions of taxpayer's appraisers. Their opinions of value represent the value of the owner's interest, rather than the market value of the property. However, the court does not accept the Benson appraisal in whole. Even with open membership and a lower joining fee, the evidence is that it would take seven to eight years to sell 425 memberships. This is difficult to establish with precision because of the differences in clubs and courses. Certainly, it appears that the Awbrey Glen course will take at least eight years to sellout. The Crosswater course will take less time, but it gives access to two additional Sun River courses. Delaney testified that taxpayer expected to sell 40 to 50 memberships per year under the existing conditions and projected a sellout of the memberships in 2004. Based on all the evidence, the court is persuaded that the most probable sellout period is eight years.

Taxpayer has offered invitational memberships that permit people who are not residences of the Broken Top community to join the golf course. However, those memberships are subject to cancellation. Taxpayer's experiments along those lines and financing of memberships does not appear to have significantly increased the memberships.

In summary, the court accepts Benson's judgment of 425 open memberships with a joining fee of $15,000. However, the court finds that his discounted cash-flow analysis must be adjusted to reflect the eight-year sellout period and

greater risk. The court finds that a 15 percent discount rate and an 11 percent reversion rate are appropriate. Of necessity, the court has made some other adjustments in revenue and expenses over the eight-year period. Based on all of those adjustments, the court's analysis indicates a value of $5,740,000 (rounded). If approximately 10 percent is deducted for the value of personal property (furnishings, fixtures, and equipment), the net indicated value is $5,166,000.

Although the discounted cash-flow method is accorded the greatest weight, the court finds that the market would also consider and give some weight to the other approaches. The subject course cost somewhere around $10 to $12 million to construct, exclusive of land cost. That significant amount is reflected in the high quality of the course, its large and spacious clubhouse and the other improvements. While that quality and those costs may not produce an immediate return, in the long run they will have significant effect upon the property's value. Likewise, where the sales-comparison approach indicates that golf courses of similar quality sell for approximately $9,000,000, potential buyers will consider that information in judging the present as well as the future worth of the subject course.

In the court's judgment, the real market value of the subject property as of July 1, 1997, was $6,000,000. That is only 50 percent of the property's cost new when the property was only four to five years old. That amount also reflects a discount from the sales-comparison approach of approximately 33 percent. Those discounts seem appropriate in view of the risk associated with a golf course that had been operating at a loss and which has significant local competition. On the whole, considering all factors, the court believes that the market would be more optimistic and round up the value indicated by the discounted cash-flow method. Therefore, the court finds that the real market value of the subject property as of July 1, 1997, was $6,000,000. Costs to neither party.