IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

CLACKAMAS COUNTY ASSESSOR, )
)
      Plaintiff, ) TC-MD 110577C
)
  v. )
)
MEPT 212 CORPORATE CENTER LLC, )
)
      Defendant. ) **DECISION**

Plaintiff appeals and Defendant cross-appeals the 2010-11 roll value of an industrial property in Clackamas (subject property) as adjusted by BOPTA. The property is identified in the Clackamas County Assessor's records as Account No. 00479299.

A trial was held by telephone on November 29, 2011and continued on December 1, 2011. Kathleen J. Rastetter, Senior County Counsel, Clackamas County, and Stephen L. Madkour, Clackamas County Counsel, appeared on behalf of Plaintiff. Ronald R. Saunders (Saunders), Registered Appraiser, submitted an appraisal for Plaintiff and testified on Plaintiff's behalf. Christopher K. Robinson and Sharon Barton Tuppan, Attorneys at Law, appeared on behalf of Defendant. Saunders has approximately 35 years of appraisal experience. Scott Kappes, SIOR, with 26 years of real estate experience, and who has been involved in hundreds of real estate transactions, testified for Defendant. Molly D. Hartsock (Hartsock), Certified General Appraiser and Director, National Property Valuation Advisors, has been active in the commercial real estate industry since 2003, as a bachelor's degree in business administration from the University of Southern California and is a licensed appraiser and Oregon, Washington, California, and Hawaii, also testified for Defendant. Finally, Todd Liebow, an MAI with 33 years of appraisal experience, testified on behalf of Defendant.

Plaintiff's Exhibit 1, Defendant's Exhibits A through I, and Plaintiff's Rebuttal Exhibits 2 through 8 were offered and admitted without objection.

## I. STATEMENT OF FACTS

The subject property is a 12 acre parcel zoned for light industrial use near Highway 212 and SE 114th Avenue in Clackamas across from a Fred Meyer distribution warehouse. The subject is improved with two steel frame, concrete tilt-up industrial buildings (A and B). (Ptf's Ex 1 at 8, 40; Def's Ex A at 15, 50.) The two structures were built in 1995 or 1996. (Ptf's Ex 1 at 8; Def's Ex A at 15.)

The net rentable area of the subject property is 233,425 square feet, including 23,175 square feet of office space. (Ptf's Ex 1 at 39; Def's Ex A at 14.) Building A is 164,750 square feet with 14,500 square feet of office space and was vacant as of January 1, 2010, the date of valuation for the 2010-11 tax year. (Ptf's Ex 1 at 8; Def's Ex A at 2.) The previous tenant had used it for light manufacturing of clean room components. (Ptf's Ex 1 at 8.) That tenant filed for bankruptcy on October 21, 2009, and vacated on December 29, 2009. (Def's Ex A at 2.) Building B is 68,675 square feet with 8,675 square feet of office space. (Ptf's Ex 1 at 8; Def's Ex A at 2.) On the date of valuation it was leased to a single tenant as a distribution warehouse. (Ptf's Ex 1 at 8; Def's Ex A at 2.)

The 2010-11 roll value of the subject property was set by the Clackamas County Board of Property Tax Appeals (Board) at $9,157,996. (Ptf's Compl at 2.) Plaintiff appeals the Board's order, requesting a value no less than $11,099,600. (*Id.* at 1.) However, Plaintiff, in closing, asked the court to sustain the Board's value of $9,157,996. Defendant in turn requested in its Answer that the roll value of the subject property be reduced to $8,017,070. (Def's Ans at 1.)

/ / /

At trial, Defendant presented evidence valuing the subject at $8.8 million, and argued in closing that the evidence supported the value of $8.8 million.

## II. ANALYSIS

The issue before the court is the real market value (RMV) of the subject property[1] as of January 1, 2010.

A.      *Standard of valuation: real market value of the fee simple estate.*

Real property in Oregon is assessed at the lesser of its fee simple estate's RMV or its maximum assessed value. *Deschutes County Assessor v. Broken Top Club, LLC* (*Broken Top*), 15 OTR 231, 236 (2000). RMV is defined by statute as:

> "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

ORS 308.205(1).[2]

Because the object of valuation is the fee simple estate, "the effect of existing leases on the value to the owner is disregarded." *Broken Top*, 15 OTR at 236 (citing *Swan Lake Mldg. Co. v. Dept. of Rev.*, 257 Or. 622, 625 (1971)). This is so because a tax upon the fee simple estate is a tax upon the property's "bundle of rights," regardless of who exercises those rights at a given time. *See PGE v. Dept. of Rev.*, 11 OTR 78, 87 (1988) (ownership "is not a single indivisible concept but a collection or bundle of rights with respect to the property") (quoting *Merrill v. Commissioner*, 40 TC 66, 74 (1963)). The complete bundle of property rights includes the right to occupy a property, as well as rights to sell, lease, mortgage, or give away interests in it. Appraisal Institute, *The Appraisal of Real Estate* 112 (13th ed 2008). Often, as in this case,

---

[1] There is some disagreement as to the proper classification of the subject property. Plaintiff describes subject property as industrial, while Defendant describes it as commercial. The exact classification is not relevant to this appeal.

[2] All references to the Oregon Revised Statutes (ORS) are to 2009.

owners of investment property do not desire to occupy the property, but prefer instead to lease it. In a lease, the owner temporarily assigns the right to occupy to a tenant in exchange for rent, but the right to occupy has the same value whether it is "cashed in" with a tenant or retained by the owner. Like a game show contestant who wins an expensive car, the owner of a vacant industrial property must pay taxes upon a non-cash asset, regardless of whether she intends to drive it, sell it, lease it, or give it away.

B.    *Burden of proof*

The burden of proof in this court is a "preponderance" of the evidence and falls upon "the party seeking affirmative relief." ORS 305.427. The Oregon Supreme Court has stated that:

> " 'Preponderance' derives from the Latin word 'praeponderare,' which translates to 'outweigh, be of greater weight.' 8 Oxford English Dictionary 1289 (1933). With regard to the burden of proof or persuasion in civil actions, it is generally accepted to mean the greater weight of evidence."

*Riley Hill General Contractor, Inc. v. Tandy Corp.*, 303 Or 390, 394, 737 P2d 595 (1987). This court has previously ruled that "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971) (citation omitted).

In this case, both parties are seeking affirmative relief. Plaintiff is requesting an increase in the roll value; Defendant is requesting a decrease. For either party to obtain relief, its evidence must be sufficient to render it probable that BOPTA's valuation was incorrect. If that showing is made, the court then determines whether and how much the value should be adjusted. Additionally "[w]hen the determination of real market value * * * is an issue before the court, the court has jurisdiction to determine the real market value * * * on the basis of the evidence before the court without regard to the values pleaded by the parties." ORS 305.412.

/ / /

C.       *Indicated value of the subject property*

Saunders' valuation on behalf of Plaintiff is a reconciliation of the direct capitalization and sales comparison approaches, with "slightly more weight" given to direct capitalization. (Ptf's Ex 1 at 68.)  Hartsock's valuation on behalf of Defendant is a reconciliation of yield capitalization, direct capitalization, and sales comparison approaches, of which Defendant found the two income capitalization methods to be the "most relevant," with the sales comparison approach providing only "secondary" support.  (Def's Ex A at 37.)  Neither party applied the cost approach.

1.       *Direct capitalization*

The parties largely agree regarding the rate of market rent.  After analyzing lease comparables, Saunders found a market rent of $1,078,452 per year for the two buildings combined.  (Ptf's Ex 1 at 66.)  Hartsock found a market rent of $1,064,886.  (Def's Ex A at 33.) Each party's figure is reasonably supported by comparables, and the numbers are within the margin of uncertainty.  Accordingly, the court finds that the subject property's market rent as of January 1, 2010, was $1,070,000.

Hartsock identifies a significant additional source of revenue for the property, labeled "Recoveries," in the amount of $351,080.  (Def's Ex A at 33.)  This income source is also referenced in the "Income & Expense Summary" prepared by Hartsock for 2008 and 2009.  (*Id.* at 23.)  Saunders does not report this revenue, which does not appear to be derived from the lease comparables.  Absent other information, the court will disregard the "Recoveries" revenue because it is unclear whether the revenue arises from the value of the land or from contract rights.

/ / /

The two parties vary in their calculation of vacancy and collection loss. Saunders derives his seven percent vacancy rate from analysis of the industrial market in the Milwaukie/ Clackamas submarket. (Ptf's Ex 1 at 32-33.) Saunders' figure is rounded down from the overall submarket vacancy rate of 7.2 percent that he reports from Grubb & Ellis Realty. (*Id.*) Hartsock provides market data from Colliers International indicating that the submarket vacancy rate was 6.9 percent, but that if "owner-user buildings" are excluded the vacancy rate was 15.3 percent. (Def's Ex A at 7.) Hartsock provides additional data from CoStar indicating that the vacancy rate for "warehouse distribution buildings over 10,000 square feet" was 17.8 percent. (*Id.*) Nevertheless, Hartsock settled on a nine percent vacancy rate derived from the market, but based on a projected five-year lease, with an average down time between leases of 12 months and a 65 percent probability of renewal (of the lease), for a weighted average down time of 4.20 months, resulting in a "Weighted Average Turnover Vacancy" of 6.54 percent. (Def's Ex A at 22.) Hartsock then adds a two percent credit loss allowance to arrive at her rounded vacancy rate of nine percent. (*Id.*)

The court finds the evidence supports a vacancy rate of seven percent. Both parties agree that rounding to the nearest percentage point is appropriate, and the seven percent figure is supported by both the Grubb & Ellis and the Colliers International market surveys. Hartsock's derivation of a nine percent vacancy is speculative and rests on unsupported assumptions about the likelihood of lease renewals and the time between leases. In fact, a building such as the subject property that had been leased for 14 years could be vacant for a whole year and still have a 6.7 percent vacancy rate. Nor has Hartsock provided sufficient information to warrant excluding "owner-user buildings" and light industrial properties from the market surveys.

/ / /

The parties' operating expense figures diverge significantly. Saunders estimates expenses of five percent of effective gross income (EGI). (Ptf's Ex 1 at 67.) Saunders arrives at that estimate by forecasting a one percent property management fee, two percent replacement reserves, and two percent fixed costs during periodic vacancies. (*Id*.) Hartsock projected operating expenses of 27 percent of EGI. (Def's Ex A at 33.) However, Hartsock's figure must be adjusted because all of her comparables were triple net leases, yet she deducts expenses that would be paid by the tenant in a triple net lease. (*See* Def's Ex A at 19, 33.) Generally under a triple net lease the "tenant pays utilities, taxes, insurance, and maintenance, and the landlord pays for structural repairs only." Appraisal Institute, *The Appraisal of Real Estate* 451 (13th ed 2008). Even after removing expenses for taxes, insurance, utilities, and security, Hartsock's listed expenses for maintenance, property management, and "Non-Recoverable Expense" amount to 9.8 percent of EGI. Of that 9.8 percent, three percent is attributable to property management fees, 6.7 percent to repair and maintenance, and 0.15 percent for non-recoverable expenses. (Def's Ex A at 33.)

Saunders's estimation is based on his opinion of what expenses "typically" are, whereas Hartsock's is based on the subject property's 2008 and 2009 actual expenses. Because repair costs vary between properties, and because Hartsock's estimate is based on the history of the subject property, the court gives more weight to Hartsock's estimate of operating expenses. Given the age of the building and its large size, Hartsock's estimates are not unreasonable. Therefore, the court finds that operating expenses are 10 percent of EGI.

The court agrees with the parties that the appropriate capitalization rate is 8.5 percent. (Ptf's Ex 1 at 67; Def's Ex A at 33.) This is the rate derived by both appraisers from their respective comparables, and is well supported by market data.

Therefore, the court applies the direct capitalization method as follows. The subject property's potential gross income was $1,070,000. Deducting seven percent of PGI for vacancy and collection loss results in an effective gross income of $995,100. Deducting 10 percent of EGI for operating expenses yields a net operating income (NOI) of $895,590. Dividing by the 8.5 percent capitalization rate yields an indicated value of $10,536,353.

The court gives little weight to the "Discounted Cash Flow" tables presented by Hartsock because that analysis is highly contingent on uncertain initial variables. (*See* Def's Ex A at 29-31.) For reasons given above, the court disagrees with Hartsock's choice of a 9 percent vacancy rate. And, by Hartsock's own admission, the choice of a discount rate is made "within a broad range, depending upon numerous risk factors." (*Id*. at 25.) That range is from "7.50 to 12.50 percent." (*Id*. at 27.) In this case, the court lacks the means to evaluate Hartsock's initial assumptions.

2.     *Sales comparison*

Using sales comparables, Saunders derived a price per square foot of $52.00, while Hartsock found a price of $47.00 per square foot. (Ptf's Ex 1 at 59; Def's Ex A at 37.) Saunders' per foot value translates into a value of $12,138,100. (Ptf's Ex 1 at 59, 68.) Hartsock's per foot value results in an indicated value of $10,970,975. (Def's Ex A at 37.) Hartsock adjusted her indicated value under the sales comparison approach and arrived at a final value indication of $8,700,000. (*Id.*)

The two experts agree that the comparable sale most similar to the subject property is a 126,000 square foot warehouse located at 17625 NE Sandy Boulevard that sold in June 2009 for $48.66 per square foot. (Ptf's Ex 1 at 59; *see* Def's Ex A at 35-37.)

/ / /

Saunders adjusts the Sandy Boulevard sale upwards "for less parking, lower percentage of office build out and lack of an elevator to serve the mezzanine level." (Ptf's Ex 1 at 59.) He adjusted downward for its smaller size. (*Id*.) Hartsock also adjusted downward for size, as well as for location; she did not adjust upward. (Def's Ex A at 36.) While both appraisers made certain adjustments to the sale of that property, neither specifically quantified the dollar value of their adjustments.

The court gives little weight to the other comparables provided by Saunders. Of the three, one sold in 2007 and one in early 2008, at a time that both parties agree market conditions were significantly different. (Ptf's Ex 1 at 58.) The other is fifteen miles away from the subject property and required a large downward adjustment for "excess land," making it seem dissimilar to the subject in important ways. (*Id*. at 59.)

In addition to the Sandy Boulevard sale, Hartsock's comparables include two sales to tenants at of $77.32 and $82.17 per square foot, and two sales from 2007-08 to which Hartsock applied difficult to quantify adjustments for market conditions. (Def's Ex A at 36, 57-61.) Hartsock adjusted the two tenant sales downward considerably for size, condition, location, and office space percentage.

On the basis of the evidence before it, the court accepts a tentative price of $50 per square foot. Multiplied by the subject property's size of 233,425 square feet, this yields an indicated value on the valuation date of $11,671,250 under the sales comparison approach.

3.    *Adjustments below the line*

Hartsock claims numerous deductions from the "preliminary" indicated value due to the fact that the subject property is not "stabilized." These adjustments include: $1,028,874 for "Rent Loss"; $217,470 for "Recovery Loss"; $659,000 for tenant improvements; $209,564 for

leasing commissions; five percent of the above in "Unearned Profit"; and $100,000 for "Near-term Capital Items." (Def's Ex A at 32-33.) The court will examine each of these adjustments in turn.

As a general matter, a property does not lose value for tax purposes when it becomes vacant, because in assessing real property "the effect of existing leases on the value to the owner is disregarded." *Broken Top*, 15 OTR at 236. (citations omitted). However, this court has deferred to the opinion of the appraisal community in allowing a rent loss deduction from value after capitalization in the case of a "problem property." *See Kailes v. Josephine County Assessor* (*Kailes*), 16 OTR-MD 348, 356-57 (2001); c*f*. Appraisal Institute, *The Appraisal of Real Estate* 580-92 (11th ed 1996). Nevertheless, the most recent edition of the appraisal text relied upon by the court in *Kailes*, which was submitted into evidence by Defendant, has dropped all discussion of problem properties, rendering the continued applicability of the theory within the appraisal community an open question. *See* Appraisal Institute, *The Appraisal of Real Estate* (13th ed 2008).

In fact, a rent loss deduction, while allowable under the *cost* approach, presents difficulties under the *direct capitalization* approach. With sufficient lease comparables, vacancy losses and market rent take account of factors such as rent loss during lease up and reduced rent due to increased supply of space. And because a capitalization rate is derived from comparables that have presumably accounted for their own vacancy rates above the line, an appraisal that deducts for rent loss below the line calls into question the key variables used in direct capitalization.

However, some vacancy is related to "disequilibria in supply and demand," and is not accounted for by ordinary vacancy losses. *See* Appraisal Institute, *Dictionary of Real Estate*

*Appraisal* 121 (4th ed 2002) (definition of "frictional vacancy"). In such a case, rapidly changing market rents would render market derived variables unreliable. A property's income and occupancy would not be "stabilized." *See id.* at 274 (stabilized income and occupancy occur once "abnormalities in supply and demand or any additional transitory conditions" are no more, and stable economic conditions exist).

In the matter at hand, the court is persuaded that on the date of valuation the parties forecast market fluctuations beyond the level of ordinary frictional vacancy. Defendant's expert Kappes testified that there was a five year supply of similar property on the market at the time, and that lease up would be expected to take two to three years. Additionally, according to the testimony there is 1,000,000 square feet of new construction and 1.5 million square feet of available space competing with the subject. In light of these extraordinary market conditions, the court finds that a deduction of $1,000,000 for rent loss is appropriate.

Hartsock also seeks a deduction for "Recovery Loss," which is presumably related to the cessation of the extra income from "Recoveries" that she identifies in her direct capitalization analysis. Because the court does not include recoveries in potential gross income, it will not allow a below the line deduction for its absence.

Hartsock also seeks a deduction of $4.00 per square foot for tenant improvements to Building A, an amount that she admits is "above average." (Def's Ex A at 21.) In general, tenant improvements are "only done if the market dictates it." *Appraisal of Real Estate* at 480. They may be factored in above or below the line in any given property. *Id.* Consequently, the court looks for evidence of what tenant improvements are factored in at a given rent. Here, the court is persuaded that the next tenant of the subject property will require an amount of remodeling above the market average. To the extent that tenant improvements are in line with

the market average, they are accounted for in the market rent and no deduction is allowed. Here, the court is persuaded that the subject property requires improvements of $2.00 per square foot over and above the market rate and will allow a deduction below the line in that amount. For a 164,750 square foot building, this yields a total deduction of $329,500.

After hearing testimony from the parties, the court allows a deduction of $250,000 for projected leasing commissions. The allowability of such a deduction depends on whether deductions for leasing commissions have already been taken above the line in the comparables from which the capitalization rate is derived. Based on testimony, the court finds that such an adjustment is necessary to accurately account for the subject property's value.

Hartsock's proposed deduction for unearned profit is not supported by the evidence and not allowed.

Finally, the court accepts Hartsock's $100,000 adjustment for capital expenditures to be made immediately after purchase. Testimony at trial established that these costs were for paving the parking lot and exterior painting.

4.    *Final estimate of valuation and assessment*

Like the parties, the court places most weight on the direct capitalization approach for this property because the lease comparables show more consistency. Accordingly, the court begins with $10,536,353 as the subject property's preliminary value. After deducting $329,500 for tenant improvements and $100,000 for near term capital expenditures, $1,000,000 for rent loss, and $250,000 for leasing commissions the court finds that the value of the subject property as of January 1, 2010, was $8,850,000 (rounded).

/ / /

/ / /

III.  CONCLUSION

As indicated above, after carefully weighing the evidence in light of applicable law and appraisal methodology, the court concludes that the RMV of the subject property as of January 1, 2010, was $8,850,000.  Now, therefore,

IT IS THE DECISION OF THIS COURT that for tax year 2010-11 the real market value of Defendant's property, identified as Clackamas County Assessor's Account 00479299, was $8,850,000.

Dated this ___ day of July, 2012.

_____
DAN ROBINSON
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Dan Robinson on July 9, 2012.  The Court filed and entered this document on July 9, 2012.*