554        July 31, 2012        No. 62

IN THE OREGON TAX COURT
REGULAR DIVISION

TETHEROW GOLF COURSE LLC,
*Plaintiff,*

*v.*

DESCHUTES COUNTY ASSESSOR
and Department of Revenue,
*Defendants.*

(TC 4988 & 5020)

TETHEROW GLEN 58 LLC,
*Plaintiff,*

*v.*

DESCHUTES COUNTY ASSESSOR
and Department of Revenue,
*Defendants.*

(TC 5019)

Plaintiffs (taxpayer) appealed the real market value of a golf course and adjacent real property in Deschutes County. The court found that taxpayer's valuation evidence did not effectively consider two significant facts, namely a bank appraisal completed approximately five months before the assessment date, and the arm's length purchase of the subject property within a short time after the assessment date. As a result of the failure of taxpayer's expert to confront and rebut the indicator of value present in the bank appraisal and sale, the court placed little to no weight on the opinion of the expert and therefore taxpayer did not meet its burden of proof as to value. The court further found that that the value of the golf course should be consistent with the range of values established by the bank appraisal and sale of the subject property, and that Defendant (the county)'s trending analysis suggesting a range of five percent decline in value for golf course properties was acceptable in light of taxpayer's failure to carry its burden of proof.

Trial was held August 15 & 16, 2011, in the courtroom of the Oregon Tax Court, Salem.

Neil R. Bryant, Bryant Lovlien & Jarvis PC, Bend, argued the cause for Plaintiffs (taxpayer).

Laurie E. Craghead, Deschutes County Counsel, Bend, argued the cause for Defendant Deschutes County Assessor (the county).

Decision rendered July 31, 2012.

**HENRY C. BREITHAUPT, Judge.**

## I.   INTRODUCTION

This matter is before the court after a trial. At issue is the value for property tax purposes of a golf course. The 2009-10 and 2010-11 tax years are at issue. The relevant assessment dates are therefore January 1, 2009, and January 1, 2010. Also involved in the case are the values of 58 residential lots, adjacent to the golf course, for the 2010-11 tax year only.

## II.   FACT

A.   *Golf Course*

The facts relevant to this opinion are not numerous and are, for the most part, not subject to dispute. The Tetherow golf course is a very high quality golf course located in Bend, Oregon. The development of the course was initially undertaken in connection with adjacent residential lots, a clubhouse and other facilities.

The course was opened in the summer of 2008.[1] The course was purchased by the present owners in February 2009, for a price of $10,500,000. In the current ownership group is one person who is a both a former golf professional and has been associated with the development of the course under prior ownership. The other person in the ownership group is a sophisticated investor. In the summer of 2008, a financial institution extended a mortgage loan to the prior owners of the course. The loan was on a nonrecourse basis. In connection with that loan an appraisal was commissioned and completed that placed a value on the course of $10,000,000, including personal property.

The economic conditions in the United States and in the Bend, Oregon area went through significant change during the period of 2007 to 2011, some of which may not yet have fully played out. Bend had experienced significant growth in terms of development of residential lots,

---

[1] Unless otherwise noted, references to exhibits are to exhibits in case TC 5019.

construction of homes and development of golf courses prior to the initial valuation date of January 1, 2009. Those trends had slowed significantly as of January 1, 2009. Testimony of managers of other golf clubs in the Bend area establishes that clubs have experienced loss of members and have decreased membership fees in response to deteriorating economic conditions.

The golf course was developed within a context that persons who bought adjoining residential lots would be required to become members of the golf club owning and operating the course. The membership fee called for in the development documents was, except for certain special memberships, $30,000 for each lot. In addition to membership fees, members are required to pay monthly dues. This membership obligation is a covenant recorded in the land records and binding on persons who purchase residential lots. There are memberships available to persons other than lot owners, but the memberships are not open to the public generally.

Plaintiff (taxpayer) presented an appraisal report at trial and a report reviewing that appraisal as to the January 1, 2009, assessment date. Defendant Deschutes County Assessor (the county) presented an appraisal report for the 2009-10 tax year. For the 2010-11 tax year the county did not present an appraisal report but based its determination of real market value on a trending analysis applied to the value it asserted for the 2009-10 year.

B.    *Residential Lots*

The lots located next to the golf course are divided into two types, those with a view of the golf course and those without such a view. All of the lots are of roughly the same size. None of the lots are improved with dwellings but all the lots are prepared for such dwellings to be constructed. As mentioned above, any buyer of a lot is required to purchase a membership in the golf club for $30,000.

III.   ISSUE

The issues in this case are the real market value of the golf course for the 2009-10 and 2010-11 years and the real market value of the residential lots for the 2010-11 year.

# IV.   ANALYSIS

A.   *Golf Course*

The real market value of property is a question of fact as to which taxpayer bears the burden of proof. ORS 305.427 (2009). That burden is successfully borne only if the court can conclude that the value asserted by taxpayer is, more probably than not, the value of the property as of the assessment date in question. In this case there are two years and two assessment dates: January 1, 2009, and January 1, 2010. The court will begin with a determination as to the value of the golf course as of January 1, 2009.

As to the real market value of the golf course as of January 1, 2009, there are two very significant facts that taxpayer does not effectively deal with in the evidence and expert opinion it has presented to the court. The first fact, chronologically, is the bank appraisal completed in the summer of 2008, approximately five months before the assessment date. That appraisal concluded a value for the golf course at $10,000,000, including personal property. That appraisal was done for a bank that was in no way related to the owners of the course. The court must conclude that it was done by a financial institution that had no economic or other interest in overstating the value of the course.

The second, and more important, fact is the arm's length purchase of the very property at issue within a short time after the assessment date for a purchase price of $10,500,000. Taxpayer's primary expert placed little or no weight on this sale of the subject property. The expert explained this by asserting that he felt the purchase was the product of an emotional attachment to the property on the part of the one owner who was and had been most involved in the day to day development of the property.

Taxpayer's expert witness offered no objective information to support his conclusion that the sale was the product of emotional factors. There was no testimony by the second owner of taxpayer, a person acknowledged to be a sophisticated investor. Nor did the expert offer any evidence that the sale was other than an arm's length transaction.

The owner most involved in the day to day development of the property did not attribute the purchase price to emotional considerations. Rather, that person testified that, in his view, he and his partner paid approximately $3.5 million for the golf course itself and $7 million for the right to collect membership fees as sale of adjoining lots occurred. That testimony confirms that the value of the property was equal to the purchase price. This conclusion follows for the simple reason that the ability to collect the membership fees was an income potential of the property itself.[2] The valuation of that income potential by the parties to the sale represents a very good indicator of the value of the property.

The failure of taxpayer's expert to adequately confront and rebut the strong indicator of value present in the bank appraisal and the March 2009 sale leads the court to place little, if any, weight on the opinion of value expressed by taxpayer's expert witness for the 2009-10 year.[3] The Tetherow course was designated as the best new course in the nation by Golf Magazine. The architect who designed Tetherow was similarly honored. There is no evidence that the Mountainview course has ever achieved such recognition. It is also noteworthy that taxpayer's expert did not use the Mountainview course as a comparable for the 2010-11 tax year. The only explanation given for this difference was that the expert had used different thinking for the later year. That suggests that the opinion of the expert was entirely too subjective and not grounded in objectively verifiable fact.

For the foregoing reasons, the court places no reliance on the opinion expressed by the expert witness for

---

[2] This owner of taxpayer appears to have believed that receipts used to pay down debt on the property were somehow not relevant to a determination of the value of the property because they went directly to the bank. This view improperly confuses the value of property with the method of financing acquisition through debt, equity or both. It also would be relevant if the owner's interest in the property or the lender's interest in the property were subject to assessment. However, it is the property, not the interests of various parties, that is subject to assessment and taxation.

[3] The opinion of the expert witness is also undermined by the choice of certain comparable properties made by the expert. For example, the expert concluded that the subject property was comparable to the Mountainview course in Boring, Oregon. The evidence leads to a conclusion that the Mountainview course is decidedly inferior to the subject.

taxpayer. Accordingly, taxpayer has not satisfied its burden of proof that the value of the property was, more probably than not, the value asserted by taxpayer.

The court finds that the value of the golf course should be consistent with the range of values established by the bank appraisal and the March 2009 sale of the subject property.[4] The court concludes that the value of the course as of the assessment date was equal to the purchase price paid by taxpayer. The expert for the county adjusted that price upward to account for a hypothetical resale of 37 memberships that were in effect as of the assessment date. As will be discussed below, this approach by the witness for the county is not accepted by the court. Nor does the court agree with other minor adjustments the witness for the county made to the sale price paid by taxpayer.

The price paid for the course was $10,500,000. Of that price the county agrees that $900,000 was attributable to personal property otherwise to be taken into account. The value of the real property as of January 1, 2009, was, therefore, $9,600,000.

As to the 2010-11 tax year, the expert opinion presented for taxpayer again does not take into account in any way the sale of the property in March 2009. If there were numerous sales of arguably comparable properties in the locale of the subject and closer to the assessment date of January 1, 2010, this might be acceptable. However those are not the facts with which the court is faced. More importantly, the value conclusion of the expert for taxpayer for the 2010-11 year is that the golf course was worth $2,785,000. That value represents a decrease of approximately $7,000,000 from the value that the court has found for the 2009-10 year.

Although the evidence supports a conclusion that values of almost all, if not all, property in Deschutes County declined during the 2009 calendar year, there is no support

---

[4] The parties presented the court with arguments as to whether the expert for taxpayer did or did not comply with the principles expressed in *Deschutes County Assessor v. Dept. of Rev.*, 15 OTR 231 (2000), relating to treatment or effect of the particular membership obligations and course operation restrictions that may have been placed on the property by the owner or a previous owner. It appears to the court that all appraisers purported to comply with *Broken Top*.

in the evidence and opinions presented by taxpayer that would justify the level of decline implicit in the opinion of the expert for taxpayer. The income indicator developed by taxpayer's appraiser involves so many assumptions and estimates that the court does not consider it to be particularly reliable. The comparable sales indicator presented by taxpayer, while not this time relying on the Mountainview property as a comparable, nonetheless involves properties at such a distance from the subject as to be suspect. Taxpayer has failed to bear its burden of proof on these critical elements in the analysis.

The county, while not presenting an appraisal of the property as of January 1, 2010, does not bear the burden of proof. What the county has presented is a trending analysis suggesting that the decline in value for golf course properties was in the range of five percent. That conclusion does not appear to be facially incorrect and it is accepted by the court in the face of the failure of taxpayer to bear its burden of proof that the value of the property was, more probably than not, lower. The approach of trending from an actual sale of the property also appears to the court to be preferable to an attempt to develop an income indicator of value for a relatively new property. Especially in difficult transition times there are simply too many assumptions that must be made in the development of an income indicator to place much reliance on that indicator.

The court concludes that the value of the golf course as of January 1, 2010, was five percent less than its January 1, 2009, value of $9,600,000: that being $9,120,000.

B.   *Broken Top*

The parties have spent significant efforts discussing the extent to which their appraisals did or did not comport with this court's decision in *Deschutes County Assessor v. Dept. of Rev.*, 15 OTR 231 (2000) (*Broken Top*). The resolution of this case does not depend on the outcome of these arguments. However, the court takes this opportunity to comment on some of the points of contention and the teaching of *Broken Top*, primarily for the reason that numerous cases have arisen recently in Deschutes County regarding

the proper valuation of golf courses and a number of those have, at the request of the parties in those cases, been placed in abeyance pending the decision in this case.

One principle of Oregon property taxation recognized in *Broken Top* is that in the valuation of property subject to existing leases or most other encumbrances, Oregon law dictates that the separate interests of an owner and the interests of lessees or beneficiaries of other encumbrances be ignored. *See, Swan Lake Mldg. Co.* v. *Dept. of Rev.*, 257 Or 622, 625, 478 P2d 393 (1971). Instead, the value of property is determined without separate valuation of the several interests in the property. Accordingly, in the case of property subject to existing leases, Oregon law requires consideration of market rent and not actual or "contract" rent due under actual leases of the property. *Id*.

The parties agree, and the court accepts, that membership agreements at golf courses may be analyzed in a fashion similar to leases in a commercial building. Accordingly, to the extent that the terms of the membership arrangements are above or below those present in the relevant market generally, the valuation must take that into account and adjust any variance so that market rates and terms are analyzed.[5]

A second principle recognized in *Broken Top* relates to what type of property is generally subject to taxation in Oregon. The appraisers for the taxpayer in *Broken Top* stated that they had done appraisals of the course in question there as a "going concern subject to rights of membership." *Broken Top*, 15 OTR at 235. This court pointed out that such an approach to valuation did not comply with Oregon law. *Id.* at 237. Oregon does not subject to taxation the intangible values associated with the operation of a property as part of a business.

A third principle central to the decision in *Broken Top* is that determination of the highest and best use of any property is a critical first step in any valuation. The court

---

[5] The membership agreements also contain buy back provisions. However the contingent nature of these and the length of time before they might be triggered appear to have resulted in there being little value attributed to them.

noted that all appraisers concluded that the highest and best use of the property at issue was as a golf course with a clubhouse. The court noted, however, that the appraisers took different views as to the best method of operating the property. The appraisers for the taxpayer concluded that continued operation of the course with membership restricted to the owners of adjacent lots was the best use. The county's appraiser concluded that an open membership policy would produce better economic returns. The court concluded that the county's appraiser had the better position. *Id*. at 241.

In this case, the county and its expert witness have taken certain positions they believe are either justified or required by *Broken Top*. The court questions the validity of certain of those positions. First, the county appears to argue that *Broken Top* requires appraisers to pretend that the property in question here had no membership agreements in place as of the date of valuation. This would be the equivalent of arguing that in a commercial building with office space leased out, an appraiser would be required to pretend that no such leases existed. The court disagrees with any such contention.

The decision in *Broken Top* never stated that existing membership agreements had to be considered as nonexistent as of the date of valuation. The most important decision in *Broken Top* was rather whether the valuation of the property should assume open membership or only membership from persons who owned an adjacent lot. The court concluded that open membership was the highest and best use as it would have the maximum economic return. *Id*. What the court did, in effect, say should be ignored were the contract rights that limited membership to lot owners. Not only does *Broken Top* provide no justification for pretending no memberships exist on the valuation date in the case where the highest and best use of the property is as a membership course, any such assumption would present significant additional problems. Would an appraiser then have to estimate a period over which the absent memberships would then be sold? The court does not accept the county's reading of *Broken Top* in this regard.

All appraisers in this case appear to agree, a membership course—as opposed to an open play course—is the highest and best use.[6] The question remains whether highest and best use is membership limited to lot owners or as open to the public. Here again, although taxpayer's appraiser was not completely clear on this, all appraisers appear to conclude that open membership would be the highest and best use of the course.

At this point in the process of valuation, the question would become what, if anything, to do with existing membership agreements. They are similar to existing leases in a commercial building. The county, as stated, argues that the appraisal should proceed as if all the existing memberships did not exist and were available for issuance as of the valuation date. From this position the appraiser for the county then concluded that a number of memberships equal to the existing number (37) would be sold in the first year following the valuation date of January 1, 2009. Concluding that those memberships would be sold for $30,000 each, the appraiser included in the revenue for 2009, in addition to other revenue, the amount of $1,110,000, representing such initial membership revenue.

As stated above, the court does not believe that *Broken Top* justifies such an approach. Nothing in the decision describes such an approach. Nor do the legal bases discussed in the opinion suggest such an approach. Rather, *Broken Top* is consistent with the process by which an appraiser, using the market rent approach to value, would take existing membership agreements into account, if the highest and best use of the property was that of operation as a membership course. However, the appraiser would then adjust the income from such leases or agreements that would accrue after the valuation date so that the income stream reflected market rates and terms rather than premium or discount rates or terms "locked in" under existing agreements. In the case of the subject property, that approach would not "re-sell" the existing memberships. Rather, as to those memberships, the only change that would be made

---

[6] By "open play" the court means open to play by the public without the obligation to become a member.

would be to determine if monthly dues—the equivalent of monthly rent—should be adjusted to equal market rates for use of a comparable facility.

As to the initial membership payment, to the extent such payments have been made, they would not be reflected in the sales indicator as the only property at issue is real property. Nor would they be reflected in the income indicator for a hypothetical purchaser contemplating a current purchase as they would not be income to that purchaser.[7] Such payments could be reflected in the cost indicator of value to the extent the sums were used to improve the property.[8] The county presented no authority or market evidence for the proposition that existing memberships should be analyzed as available for resale.

As to unsold memberships, the valuation exercise would have to confront what the market rate for a membership would be as of the valuation date, again assuming that the determination was made that the highest and best use of the property was operation as a membership course as opposed to an open play course. In this case the appraisers were in agreement that the highest and best use was operation as a membership course. They differed in where they thought the market rate for membership payments would be. It was not clear to the court whether the appraisers accepted the monthly dues as being at market rates, but the conclusion of the court in this opinion does not require a clarification of that point.

## C.   *Residential Lots*

Taxpayer's expert witness concluded that the lots with a golf course view were worth $205,000 and the lots without such a view were worth $145,000 in each case as of January 1, 2010. The county witness concluded to a value of $260,000 for the view lots and $206,000 for the lots without a view.

---

[7] No account would be taken unless, perhaps, if market evidence indicated that the prepayment feature of the membership payment affected the amount of dues that users of the course paid.

[8] The court notes that no appraiser placed any significant reliance on the cost indicator of value in this case.

The two appraisers had differences of opinion as to which lot sales in the Bend area should be considered as comparable with the subject property. Taxpayer's appraiser included sales from developments at some distance from the subject while the county's appraiser used more sales from the subject development and the neighboring Broken Top development. These differences do not, in the opinion of the court, support much of a basis for distinguishing between the two appraisals, although the court believes the analysis of the county is marginally better overall as to these matters.

However, one element that does serve to distinguish the appraisals is the error that the appraiser for taxpayer made in accounting for required membership fees at properties he felt were comparable. Taxpayer's appraiser subtracted the membership fee from the comparable lot sale price to arrive at a sale price for the real estate alone. The appraiser for the county took the same step.

The appraiser for taxpayer then used the adjusted sales prices for what he concluded were the comparable sales to support a conclusion for the value of the subject lots. However, the appraiser then took an additional deduction of $30,000, the required membership obligation of a lot purchaser at Tetherow, in concluding to a lot value. This was an inappropriate double deduction.

If an adjustment is made to the value conclusions of taxpayer's appraiser for the lots in order to eliminate the double deduction, the indicated values are $175,000 for the lots without a view and $235,000 for the lots with a view. That value appears to the court to be the proper starting point in valuing the lots. That conclusion is supported also by another appraisal of the lots done by The Bratton Appraisal Group with an effective date of May 1, 2009. Bratton concluded to a value of $175,000 for the lots without a view and a value of $235,000 for the lots with a view.

In the opinion of the court, this starting point value for the lots should be adjusted upward by $5,000 per lot to account for the marginally better comparables on which the county position is based. That leads to a concluded value of $180,000 for the lots without a view and $240,000 for the

lots with a view. This, in the opinion of the court, is the correct value as of the assessment date of January 1, 2010.

### V.   CONCLUSION

Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of the golf course for the 2009-10 tax year is $9,600,000; and

IT IS FURTHER DECIDED that the real market value of the golf course for the 2010-11 year is $9,120,000; and

IT IS FURTHER DECIDED that the real market value of the residential lots for the 2010-11 year is $180,000 for the lots without a view and $240,000 for the lots with a view.