IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| RC SPRINGFIELD 2007 LLC | ) | |
| and ROYAL CARRIBEAN CRUISES LTD, | ) | |
| | ) | |
| Plaintiffs, | ) | TC-MD 160119N |
| | ) | |
| v. | ) | |
| | ) | |
| LANE COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **FINAL DECISION**[1] |

Plaintiffs appeal the real market value of property identified as Account 1082344 (subject property) for the 2015-16 tax year. A trial was held in the courtroom of the Oregon Tax Court on November 7, 2016, in Salem, Oregon. Samuel B. Zeigler and Alex C. Robinson, Oregon attorneys, appeared on behalf of Plaintiffs. Norman Feinstein (Feinstein), Vice-Chairman of the Hampshire Companies; David Chudzik (Chudzik), MAI, PhD, licensed commercial real estate appraiser; and John Brown (Brown), commercial real estate broker, testified on behalf of Plaintiffs. Sebastian Tapia, an Oregon attorney, appeared on behalf of Defendant. Isabelle Mathews, registered appraiser; William Stich (Stich), registered appraiser; and Joey J. Lieck (Lieck), registered appraiser and appraisal supervisor, testified on behalf of Defendant. Plaintiffs' Exhibits 1 and 2 were received without objection. Defendant's Exhibit A, excluding the cost approach, was received over Plaintiffs' objection. Defendant's cost approach was excluded because Defendant's appraisers failed to include any of their calculations or analysis under the cost approach. Defendant's Exhibits B through G were received without objection.

/ / /

---

[1] This Final Decision incorporates without change the court's Decision, entered May 10, 2017. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

## I. STATEMENT OF FACTS

The subject property is a call center in Springfield, Oregon, which was constructed in 2005 as a "build-to-suit" for Royal Caribbean. (*See* Ptfs' Ex 1 at 7, 37.) Chudzik testified that "[c]all centers are essentially a sub-type of office with large, open areas where you have cubicles[.]" He determined that the subject property is Class A with an effective age of 7 years and a remaining economic life of 43 years. (*Id.* at 37.) The parties stipulated that the subject property is 160,007 square feet. (*See id.*) It is situated on a 21.62-acre parcel. (*Id.* at 32.) The parties stipulated that the subject property's land value was $12,725,299. The subject property is primarily one-story, but has a two-story central corridor with private offices. (*See id.* at 37.) The largest parts of the subject property are open floor plan call center spaces. (*See id.*) It also features an entry lobby, a fitness center, a cafeteria, and a data room. (*See id.*) The subject property includes unique features designed to evoke a cruise ship, such as a mast over the entryway, spiral interior staircases, and a "waved barrel-vaulted roof." (*See id.*)

The subject property is LEED Gold certified. (Ptfs' Ex 1 at 37.) Stich testified that, when he toured the subject property, he observed a 2,500-square foot room dedicated to the LEED certification and Royal Caribbean's pride at having incorporated those standards into its construction of the subject property. (*See* Def's Ex A at 13.) Marketing materials state that

> "[the subject property] was awarded a 'gold' rating from the U.S. Green Building Council's esteemed Leadership in Energy and Environmental Design. [It] was one of just 10 buildings in Oregon to earn the gold ranking by 2006. Additionally, the building was awarded the grand prize by Building Magazine for Best New Construction in August 2007."

(*Id.* at 63, 66-68.) Royal Caribbean's director of global facilities and properties pursued the LEED Gold certification to support Royal Caribbean's "environmental statement as a company." (*Id.* at 67.) Environmental stewardship is part of the company's brand. (*See id.*)

A.      *Subject Property's Lease, Sale, and Subsequent Listing*

The subject property's lease to Royal Caribbean commenced in 2006 at an annual rate of $21.08 per square foot, triple net. (Ptfs' Ex 1 at 67.) The lease term is 20 years with two percent annual escalations. (*See id.*) "Royal Caribbean has the right to two five-year extension terms." (*Id.*) Chudzik testified that a "build-to-suit lease is a lease that's structured prior to the construction of a building that is built specifically for the tenant. And the rent structure in the lease, although it could essentially reflect prevailing market conditions, it is very closely tied to the construction costs for the particular building, plus a suitable profit for the developer[.]" He determined that the subject property's contract rent was "significantly above a market rent rate" because the "[r]ent was set on the basis of construction cost and not a market rent." (*See id.*) Brown testified that, in his experience, the rental rate for a build-to-suit property is "usually considerably higher than market rent." He testified that he believed the subject property's contract rent, which was approximately $25 per square foot, triple net, as of January 1, 2015, was "considerably higher than what is achievable in the marketplace" as of that date.

The subject property was acquired by its current owner as an investment property in 2008 for $46,907,921, or $289 per square foot. (*See* Ptfs' Ex 1 at 18, 58.) Feinstein testified that the owner "negotiated a price that was $4,100,000 above the then existing mortgage balance at the time." He testified that the deal was based "primarily" on the Royal Caribbean lease with a 20 year term and on Royal Caribbean's credit. Feinstein testified that he did not discuss the purchase with brokers, evaluate the market price for the subject property without Royal Caribbean as a tenant, or otherwise take into account the subject property's physical appearance.

Feinstein testified that the owner considered selling the subject property in 2009 and again 2013, 2014, and 2015. He testified that "there was a market at the time [2009] where

buyers were paying a certain percentage of cash above the then mortgage balance." Feinstein testified that, in 2009, the owner asked $60 million, which "was a function of the then balances of mortgages on the property, and a percentage above that." The subject property was listed for sale in 2014. (*See* Ptfs' Ex 1 at 18.) A potential buyer offered $56 million in July 2015. (*See id.*; *see also* Def's Ex B.) Chudzik wrote that, according to the broker representing the offeror, the offer was based on the contract rent and the creditworthiness of Royal Caribbean. (*See* Ptfs' Ex 1 at 18.) The owner accepted the offer, but the sale was never completed. (*Id.*) Chudzik testified that the offeror contacted Royal Caribbean to see if it would extend its lease; it would not, so the offeror "lost interest." Feinstein testified that the offer "never materialized." He testified that the offer was all-cash, so "the buyer needed to get financing." Feinstein surmised that the offeror could not get financing.

Feinstein testified that the owner would not sell the subject property for $18 million as of the date of trial because of the remaining 10 years on the lease.

B.     *Subject Property's Market*

Chudzik described Eugene-Springfield as "a tertiary market," noting that "[m]ost office users are local firms or satellite locations of national or regional firms. The subject property is an example of the latter." (Ptfs' Ex 1 at 28.) Chudzik found most office sales in that market involved buildings of 50,000 square feet or less. (*See id.* at 28-29.) Brown testified that there is nothing comparable to the subject property in terms of size in the Eugene-Springfield market. Chudzik testified that, "given the larger size of [the subject] property," he considered its market "to be more broad, more regional, spanning at least the western half of the nation, perhaps the entire nation." (*Id.* at 29, 40.) Chudzik wrote that "there is an active market for larger office buildings and call centers like the subject with both owner-user and investor buyers." (*Id.* at 7.)

Brown testified that the subject property's unique look "may or may not be accepted in the marketplace[,]" but he did not think it would add a premium and may be a detriment. The mast and waved roof features might create additional maintenance costs.

The parties disputed the market impact of the subject property's LEED Gold certification. Brown testified that "very few buildings in the private sector" are built to LEED certified standards because "it's not cost effective." He testified regarding two properties in the Eugene-Springfield market that received LEED certification: the "Inkwell Building," which is LEED Platinum, and the "Watershed Building," which is not LEED certified, but "exceeds" all the criteria. Brown testified that he rents spaces in those buildings, but gets "zero premium."

Lieck testified that LEED certified buildings command higher prices in the market. He provided a 2013 report entitled "Green Building and Property Value" by the Institute for Market Transformation[2] and the Appraisal Institute. (Def's Ex A at 80-86.) The report considered the value of green buildings based on "[f]our components of value – revenue, occupancy, operating expenses, and risk[.]" (*Id.* at 82.) The report stated that, "[i]n many markets, rental premiums are emerging in green buildings as many of today's best tenants are increasingly willing to pay a premium for green spaces." (*Id.*) It included a chart indicating that LEED buildings receive rental premiums ranging from 4 to 27 percent. (*See id.*) It further found that green buildings result in higher occupancy and lower expenses. (*Id.* at 83-84.) With respect to risk, "[b]est-in-class market position can future-proof assets, protecting the going-out cap rate." (*Id.* at 85.) The report provided a chart showing sale premiums of green commercial buildings in the U.S., with LEED buildings up to 25 percent. (*Id.*) Brown testified that he disagreed with the report.

/ / /

---

[2] The Institute for Market Transformation is a "nonprofit organization promoting energy efficiency, green building, and environmental protection in the United States and abroad." (Def's Ex A at 81.)

C.    *Plaintiffs' Appraisal*

1.    *Highest and best use*

Chudzik concluded that the subject property's "highest and best use as improved is continued office or call center use most likely as a single occupant property but potentially and less likely as a multi-tenant office." (Ptfs' Ex 1 at 40.)  "As a larger high quality office building in an area with relatively low wages and an educated workforce, the subject will likely appeal to larger corporate users for call center use similar to the current occupant, Royal Caribbean International, or potentially to investor buyers." (*Id.* at 41.)

2.    *Cost approach*

Chudzik used Marshall Valuation Service to estimate a replacement cost new of $24,996,401 for the subject property improvements. (Ptfs' Ex 1 at 43.)  To that, he added entrepreneurial profit and a developer's fee for a total replacement cost of $26,246,221. (*Id.* at 44.)  Chudzik subtracted 4.0 percent physical depreciation and 70.0 percent external or economic obsolescence, for a depreciated building value of $6,824,017. (*Id.* at 44-45.)  He described external obsolescence as "the result of diminished utility of improvements due to negative influences from outside the site." (*Id.* at 46.)  Those negative influences may "include change in market conditions, demand for particular design, size or quality of building improvements or a level of demand/supply that does not result in pricing reflective of cost." (*Id.*)

Citing *The Appraisal of Real Estate*, Chudzik used the market extraction method to estimate external obsolescence. (Ptfs' Ex 1 at 46.)  Using four properties from his sales comparison approach, he developed a replacement cost new for each property and subtracted physical depreciation, then compared the resulting value with the sales price less the estimated land value. (*Id.*)  Chudzik determined that the difference between those two values was the

measure of external obsolescence. (*Id.*) He found a range of 54 to 82 percent, with an average of 72 percent, and concluded external obsolescence of 70 percent for the subject property. (*Id.*) Chudzik testified that he did not recognize any functional obsolescence in any of his comparable sales. If he had, he would have subtracted it before the external obsolescence calculation, thereby reducing the percentage of external obsolescence. In calculating physical depreciation, he used effective age rather than actual age.[3] (*See id.*) Chudzik testified that "buildings generally do not age linearly. And in fact, the depreciation, it generally occurs less per rate of time in the beginning of a building's life than it does later. * * * [W]ith continued maintenance, you can push out * * * the potential economic life of the building further and further."

Chudzik testified that the subject property suffered from "significant external obsolescence, mainly due to the fact that[,] based on the sales comparison approach[,] * * * properties like [the subject property] trade substantially below their replacement cost."

3.      *Sales comparison approach.*

Chudzik testified that a likely user of the subject property is "a corporate user that could locate [in Eugene-Springfield] or in other similar cities throughout the western United States." Accordingly he searched for properties throughout the western United States. Chudzik testified that his six comparable sales were all larger office buildings located in secondary or tertiary markets with similar amenities to the subject property; some were call centers. He testified that the subject property's LEED certification did "[n]ot really" impact his choice of comparable sales; he considered the certification a "minor component."

Sale 1, in February 2016, was the Weyerhaeuser headquarters in Federal Way, WA. (Ptfs' Ex 1 at 53.) It is "about 300 acres of land suitable for office or industrial use[,]" a

---

[3] For instance, sale 1 was built in 1971, but Chudzik used an effective age of 18 years. (Ptfs' Ex 1 at 46.)

467,000-square foot flex building, and a 343,535-square foot office building built in 1971. (*Id.*) Chudzik determined its effective age was 18 years. (*Id.* at 46, 53.) The property was located "in a large suburban campus." (*Id.*) Weyerhaeuser was relocating to a new campus in Seattle and the buyer "made an all cash offer close to the highest offered price." (*Id.*) Of the $70.5 million sale price, the buyer "allocated $27,100,000 or $79 [per square foot] to the office building." (*Id.*) Weyerhaeuser agreed to lease-back the building at $12 per square foot, triple net, for 21 months. (*Id.*) Chudzik described Sale 1 as "an iconic building" that "was reported to be in good condition despite its age." (*Id.*) He testified that it received the 25 year award from the American Institute of Architecture and received a "Green Globe Certification" from the Green Building Initiative. Chudzik concluded Sale 1 was a low indicator for the subject property due to its "age, size and tenancy," although its location was superior. (*Id.*)

Sale 2, in November 2014, was three buildings totaling 194,620 square feet on an 11-acre campus in Hillsboro, OR. (Ptfs' Ex 1 at 54.) One building was a 98,820-square foot corporate headquarters built in 1999 and in good condition; Chudzik considered it Class A. (*Id.*) The other two buildings, constructed in the 1980s and in poor condition, were a flex office building and a research and development (R & D) building. (*Id.*) The headquarters building included "large open office areas, private offices, a 312-person capacity cafeteria, [a] fitness center and 670-person capacity auditorium." (*Id.*) The seller, Lattice Semiconductor, decided to relocate to downtown Portland and put the property on the market in 2012, asking $22 million. (*Id.*) It received two offers, accepting one from a Texas-based investor for $15,125,000 that "planned to renovate the buildings and re-tenant the property." (*Id.*) Chudzik allocated $60 per square foot to the flex and R & D buildings, resulting in $97 per square foot for the office building. (*Id.*) He concluded that Sale 2 was a reasonable indicator for the subject property. (*Id.*)

Sale 3, in January 2013, was "the Allstate Call Center in Chubbuck, ID near Pocatello." (Ptfs' Ex 1 at 52-54.) It was a 78,225-square foot "purpose-built call center" constructed in 2011. (*Id.* at 54.) Chudzik testified that the property was LEED Silver certified. Allstate leased the building for $12.31 per square foot, triple net, for a ten year term with 1.5 percent annual escalations. The property sold to an investor for $155 per square foot. (*Id.*) Chudzik determined Sale 3 was inferior to the subject property in location, market conditions (time of sale), and quality, but superior to the subject property in age, condition, and size (smaller). (*Id.* at 54-55.) He concluded: "The sales price reflects rental income and the long term high credit worthiness of the tenant, Allstate. Overall, this comparable is a high indicator for the subject." (*Id.* at 55, 59.)

Sale 4, in November 2012, was a 290,024-square foot, five-story office building located in Everett, WA. (Ptfs' Ex 1 at 55.) It was built in 1981 and previously served as the regional headquarters of Frontier Communications, a cable and internet provider. (*Id.*) It had "a typical office design reflecting older but good quality office space." (*Id.*) Although "designed for single occupant use, it could be demised into two suites with a north and south tower separated by a relatively narrower section." (*Id.*) Its "open design [was] suitable for use as a call center." (*Id.*) It included a fitness center and cafeteria, but had some deferred maintenance and needed a new roof as well as "painting and general upgrading of finishes and landscaping." (*Id.*) Sale 4 was marketed "as a sale lease-back opportunity for about one year prior to sale." (*Id.*) The buyer made an offer contingent upon the seller agreeing to lease 178,406 square feet in the north tower, leaving about 125,000 square feet vacant after closing. (*Id.*) It sold for $66 per square foot and Frontier paid initial rent of $12.50 per square foot, triple net, for its space. (*Id.*) Prior to closing, the buyer assigned the sale contract to another company. (*Id.*) Chudzik considered Sale 4 to be a low value indicator for the subject property; although its location was superior, the property was

inferior in market conditions (time of sale), size (larger), quality, and condition. (*Id.* at 55-56.) Additionally, "the assignment of [the] sale contract likely [meant] that the buyer paid an assignment fee and effectively more than the reported sale price." (*Id.*) With respect to the lease, Chudzik wrote: "Although this was the sale of the leased fee interest, the rental rate reflects a market rate for the area and the sale interest is equivalent to a fee simple estate." (*Id.* at 55.)

Sale 5, in September 2012, was a 176,609-square foot building located in "the master-planned community of Snoqualmie Ridge." (Ptfs' Ex 1 at 56.) The two story building, constructed in 1999, included 137,100 square feet of office space and 39,000 square feet of manufacturing space. (*Id.* at 52, 56.) It also includes laboratory space, "about 40,000 [square feet] of raised floor area previously used as data center space[,]" a fitness center, and a cafeteria. (*Id.* at 56.) Sale 5 was formerly owned by Philips Oral Healthcare, which relocated. (*Id.*) OSI Systems, a medical device manufacturer, initially expressed interest in leasing the property as $13 per square foot, triple net, but then decided to purchase the property for $79 per square foot. (*Id.*) Chudzik adjusted the sale price for "build-out of office in warehouse areas" for an adjusted sale price of $94 per square foot. He considered Sale 5 somewhat superior in location; similar in size, quality, and condition; and inferior in market conditions (time of sale). Chudzik concluded Sale 5 was a low indicator. (*Id.* at 57.)

Sale 6, in July 2011, was a 312,403-square foot "Class A office campus built and owned by Hewlett Packard located close to Sacramento in Roseville, CA. The three story building was no longer needed by the owner and was vacant at the time of sale." (Ptfs' Ex 1 at 57.) Sale 6, constructed in 1998, had "larger open office areas suitable for call center use, training and conference rooms, a data center area and cafeteria." (*Id.*) It was listed for several years before selling to an investor for $16 million, of which $3,750,000 was allocated to excess land,

according to the broker. (*Id.*) The price allocated to the building was $39 per square foot. (*Id.*) "The broker indicated that the relatively low price reflected the larger size of the property, the fact that [it] was vacant, the relatively weak market conditions for commercial real estate in 2011 and the seller's motivation." (*Id.*) "The buyer planned to re-tenant the building with most likely at least two tenants and anticipated demising the building for multi-tenant use. However, after closing, the buyer was able to secure a single tenant, Sutter Health, a local hospital, to lease the entire property at a rate of $11.52/sq ft, triple net." (*Id.*) Chudzik described Sale 6 as "similar to somewhat superior to the subject" property in location and quality, but inferior in market conditions (time of sale), rendering it a low indicator of value. (*Id.*)

Chudzik concluded the subject property would sell for between $95 and $100 per square foot on January 1, 2015, indicating a value of $16,000,000, rounded. (Ptfs' Ex 1 at 1, 59.)

4.      *Income approach.*

Chudzik considered seven leases to determine market rent for the subject property, of which two were also his Sales 3 and 6. (*See* Ptfs' Ex 1 at 66.) Each of his comparable leases was triple net, except for Lease 1, which Chudzik adjusted to reflect triple net. (*Id.* at 66-67.) Leases 1 through 5 were each of properties located in Eugene or Springfield. (*See id.* at 66.) Chudzik testified that he considered leases in the Eugene-Springfield market because, often, "a property's income leasing market is smaller than its * * * regional or its sales market potentially. And that's because investors and owners and users can potentially go long distances. Investors can move money across the country in an instant. And so potentially that market is bigger."

Leases 1 through 5 ranged from 30,384 to 60,680 square feet. (*See* Ptfs' Ex 1 at 66.) The lease rates ranged from $10.32 per square foot for Lease 5, a March 2013 five-year lease of a "newer midrise office building with quality and finishes similar to that at the subject" that was

used as a call center, to $15.36 per square foot for Lease 2, a June 2014 five-year renewal lease of a property built in 1924 but renovated in 1997. (*Id.* at 66-68.) Neither lease included an allowance for tenant improvements, but the Lease 5 tenant invested about $1.4 million to renovate the building for its use. (*See id.* at 67-68.)

Lease 6 was the same property as Sale 6, the 312,403 square foot office formerly owned by Hewlett Packard in Roseville, CA. (Ptfs' Ex 1 at 68.) A regional hospital leased the property for ten years beginning in February 2013 at $11.52 per square foot with annual escalations of $0.60 per square foot and a tenant improvement allowance of $20 per square foot. (*Id.* at 69.) Lease 7 was the same property as Sale 3, the 78,225 square foot call center in Chubbuck, ID. (*Id.* at 69.) Allstate leased the property for ten years beginning in October 2012 for $12.24 per square foot with 1.5 percent annual escalations and no tenant improvements. (*See id.*)

Chudzik concluded that, given the subject property's larger size, its market rent would "fall in toward the low to middle end of the range." (Ptfs' Ex 1 at 70.) He placed emphasis on Leases 3, 4, and 5, concluding a market rent of $11 per square foot, triple net, with a 10 year lease, three percent annual escalations, and a tenant improvement allowance of $10 per square foot. (*Id.*) Brown testified that he would list the subject property at $11 per square foot triple net and would "hope" he could get that. Chudzik calculated potential gross income of $1,760,000, from which he subtracted vacancy and collection loss of five percent. (*Id.* at 70-71.) He calculated effective gross income of $1,672,073, from which he subtracted expenses of $0.30 per square foot for net operating income of $1,624,071. (*Id.* at 71.)

Chudzik surveyed capitalization rates in the Springfield market as well as in the regional market for larger office buildings in secondary and tertiary markets. (Ptfs' Ex 1 at 71-72.) The Springfield market yielded a range of capitalization rates from 7.1 to 8.2 percent, whereas the

regional market yielded a range from 7.1 to 9.5 percent. (*See id*. at 72.) Of the six regional sales Chudzik considered, only one – the Frontier Communications building in Everett, WA – was used in his sales comparison approach. (*See id.* at 71.) The other five properties were a 2001 building that sold for $169 per square foot; a 1987 building that sold for $146 per square foot; a 2000 building that sold for $158 per square foot; a 2001 building that sold for $167 per square foot; and a 1957 building that sold for $133 per square foot. (*Id.* at 71.) The properties, excluding the Frontier Communications property, ranged in size from 102,000 to 233,358 square feet. (*See id.*) Chudzik selected capitalization rate of 8.0 percent for the subject property, concluding an indicated value of $20,300,000 under the income approach. (*Id.* at 72-73.)

5. *Reconciliation*

In reconciliation, Chudzik gave "significant emphasis" to the sales comparison approach, "emphasis" to the income approach, and "little consideration" to the cost approach. (Ptfs' Ex 1 at 75-76.) At trial, he testified that he gave "significant weight" to both the sales and income approaches. Chudzik concluded a real market value of $18 million. (*Id.* at 76.)

D. *Defendant's Appraisal*

Defendant's appraisers concluded that the existing use of the subject property represented its highest and best use as improved. (Def's Ex A at 20.) They performed a sales comparison approach based on three sales of multi-tenant office buildings in Portland and Beaverton with prices ranging from $210.27 to $367.21 per square foot. (*Id.* at 22-30.) They selected a price of $265 per square foot for the subject property, indicating a value of $42,400,000. (*Id.* at 55.)

Under the income approach, Defendant's appraisers considered 11 office properties, including 8 LEED Certified Green buildings. (Def's Ex A at 33.) All but one property was an

asking lease rate.[4] (*See id.* at 33-52.) All but one property was a multi-tenant office building.[5] (*See id.*) The lease rates were a mix of triple net and full service. (*See id.*) Asking lease rates for the LEED certified properties ranged from $22.68 to $31.92 per square foot. (*Id.* at 33.) Defendant's appraisers concluded that "[t]he current subject lease tends to fall below what are achievable market rents. Therefore, using the concluded market rents provided by the lease comparables gives a value that best reflects the fee simple interest." (*Id.* at 53.) They concluded market rent of $27 per square foot for the subject property. (*Id.*) Although the typical office vacancy rate was five to seven percent, Defendant's appraisers concluded a vacancy rate of three percent for the subject property because it had been 100 percent occupied since construction. (*Id.*) Because most single tenant offices were leased triple net, they concluded a "relatively low" expense rate of 10 percent. (*Id.*) From a range of 7.3 to 8.8 percent, Defendant's appraisers selected a capitalization rate of 7.5 percent for the subject property. (*Id.*) They concluded an indicated value of $50,000,000, rounded, under the income approach. (*Id.* at 54, 56.)

In reconciliation, Defendant's appraisers gave "primary weight" to the income approach, "strong secondary support" to the cost approach, and "tertiary weight" to the sales comparison approach. (Def's Ex A at 55-56.) They concluded a real market value of $49,998,000. (*Id.*)

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2015-16 tax year. ORS 308.205(1) defines real market value:[6]

/ / /

---

[4] Lease 8, signed December 30, 2014, was $22.78 per square foot for 13,365 square feet within an 180,039 square foot building in Waltham, MA. (Def's Ex A at 37, 45.)

[5] Lease 9 was a 103,279-square foot, Class B single-tenant office built in 1999 and located in Hillsboro, OR. (Def's Ex A at 47.) Asking rent was $18.96 per square foot, triple net. (*See id.*)

[6] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

"Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2015-16 tax year was January 1, 2015. *See* ORS 308.007; 308.210.

There are three approaches to value that must be considered to determine the real market value of real property: the sales comparison approach, the cost approach, and the income approach. *See* OAR 150-308.0240. In a particular case, all three approaches may not be applicable; however, each approach "must be investigated for its merit." *Id.* Whether any one approach is more persuasive in a given case "is a question of fact to be determined by the court" based on the record before it. *Pacific Power & Light Co. v. Dept. of Rev.*, 286 Or 529, 533, 596 P2d 912 (1979).

Plaintiffs bear the burden of proving their case by a preponderance of the evidence. *See* ORS 305.427. "Preponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). To meet their burden, Plaintiffs must "provide competent evidence of the [real market value] of their property." *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002). Competent evidence of real market value "includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD 110300D, WL 879285 (Or Tax M Div Mar 13, 2012).

Pursuant to ORS 305.412, this court has jurisdiction to determine the correct real market value of the subject property "without regard to the values pleaded by the parties." At trial, Defendant presented evidence in support of its request that the court increase the real market value of the subject property. However, in its closing brief, Defendant argues that Plaintiffs did

not meet their burden of proof and asks the court not to exercise is authority under ORS 305.412 to determine the subject property's real market value. (Def's Closing Arguments at 3.)

A.    *Valuation Issues*

Before considering the three approaches to value, the court begins by addressing some broader valuation issues raised by the parties.

1.    *Sale of the subject property; subsequent listing and offer; contract rent*

"A recent sale of the property in question is important in determining its market value. If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value." *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973). The subject property last sold in 2008 for $46 million. Since then, the subject property's owner has listed the subject property for sale, asking $60 million, and received an offer for $56 million that ultimately fell apart. Plaintiffs argue that those prices are a function of the subject property's above-market contract rent and the creditworthiness of the tenant, Royal Caribbean; thus, they overstate the real market value of the subject property.

"One principle of Oregon property taxation * * * is that in the valuation of property subject to existing leases or most other encumbrances, Oregon law dictates that the separate interests of an owner and the interests of lessees or beneficiaries of other encumbrances be ignored." *Tetherow Golf Course LLC v. Deschutes County Assessor*, 20 OTR 554, 561 (2012) (citing *Swan Lake Mldg. Co. v. Dept. of Rev.*, 257 Or 622, 625, 478 P2d 393 (1971)). "Instead, the value of property is determined without separate valuation of the several interests in the property. Accordingly, in the case of property subject to existing leases, Oregon law requires consideration of market rent and not actual or 'contract' rent due under actual

leases of the property." *Id.*

Plaintiffs maintain that the subject property's lease to Royal Caribbean is above-market and must be disregarded. Plaintiffs' evidence tends to support the following findings: (1) the subject property's contract rent was established to pay for the construction of the subject property, including features that another potential user might not value, such as the design elements reminiscent of a cruise ship; (2) the contract rents were established during a different market period – January 2006 – and likely do not represent market rent as of January 1, 2015; and (3) the primary factor influencing the 2008 sale of the subject property and the subsequent listing of the subject property was the 20-year lease to Royal Caribbean. For those reasons, the court agrees with Plaintiffs that the subject property's January 1,2015, real market value should not be determined based upon the sale or listing price, or the contract rent.

2.      *Value-in-exchange*

Defendant argues that Plaintiffs' requested real market value of $18 million cannot possibly be the subject property's real market value because Feinstein – an agent of the subject property's owner – admitted in his testimony that he would not consider selling the subject property for $18 million. (Def's Closing Argument at 6.) The court understands Defendant's argument, in essence, to be that Plaintiffs' requested real market value does not meet the definition of real market value under ORS 308.205(1) because "an informed seller" would not accept $18 million for the subject property. The court agrees with Defendant that the subject property is certainly worth more than $18 million to its current owner. However, as Plaintiffs stated in their closing brief, the court must determine the subject property's "value-in-exchange," not its "value-in-use."[7] (*See* Ptfs' Post-Trial Brief at 17-18.)

_____

[7] "As the Tax Court explained, 'value-in-exchange' refers to 'the amount at which property will change hands in the marketplace.' * * *. By contrast, 'value-in-use' '*is the value a specific property has for a specific*

3.      *Market effect of LEED certification*

The parties dispute whether the subject property's LEED Gold certification has any effect

on its market value.  It is evident that Royal Caribbean values the certification as part of its

brand, which includes environmental stewardship.  The question is whether other potential

buyers or users of the subject property would value the certification by paying more to purchase

or rent the subject property.  Defendant presented a short report co-authored by the Appraisal

Institute describing positive market impacts associated with LEED and other environmental

certifications: increased sales prices and rental premiums; lower expenses; higher occupancy;

and reduced risk.  By contrast, Brown testified that he saw no market impact from LEED

certification based on the relatively few LEED certified buildings in the private sector and based

on his experience leasing two properties, one of which is LEED certified and the other of which

satisfied the criteria for certification.

Although the court does not doubt Brown's expertise within the Eugene-Springfield

office market, the court finds his testimony less persuasive on this issue because the subject

property does not compete with local office properties in Eugene and Springfield; rather, it

competes in a regional or national market.  Potential buyers and users of the subject property

include larger, national companies.  Although it is difficult to quantify the market impact of the

subject property's LEED Gold certification, the court is persuaded that it tends to command

higher sales prices and lease rates, all else being equal.

4.      *Highest and best use*

"The *first* issue is the highest and best use of the property; the *second* issue is the market

---

*use.*  Use value focuses on the value the real estate contributes to the enterprise of which it is a part, without regard
to the property's highest and best use or the monetary amount that might be realized on its sale.' "  *STC Submarine,
Inc. v. Dept. of Rev.*, 320 Or 589, 595-96, 890 P2d 1370 (1995) (citations omitted).

value of the property at that use." *Freedom Fed. Savings and Loan v. Dept. of Rev.*, 310 Or 723, 727, 801 P2d 809 (1990) (emphasis in original). "Most importantly, the [highest and best use] affects what other properties may be considered comparable, a fundamentally important question when selecting so called 'comparable' sales and determining, where appropriate, which properties are selected for use in determination of elements of the income indicator analysis." *Hewlett-Packard Company v. Dept. of Rev.*, 21 OTR 186, 188 (2013), *aff'd* 357 Or 598, 356 P3d 70 (2015). The parties do not dispute the highest and best use of the subject property. They agree that its highest and best use as improved is continued use as an office or call center. Chudzik noted that the subject property would most likely be used by a single occupant, "but potentially and less likely as a multi-tenant office." (Ptfs' Ex 1 at 40.) The subject property's highest and best use must be considered in weighing the market evidence presented.

     5.    *Defendant's appraisal*

In its closing argument, Defendant abandoned its requested real market value of $49,998,000 concluded by its appraisers and requested that the court sustain the real market value of $40 million determined by the board of property tax appeals. (*See* Def's Closing Argument at 1-2.) In any event, the court finds that no weight should be placed on Defendant's conclusions under the sales comparison and income approaches.[8] In each approach, Defendant's appraisers relied almost entirely upon multi-tenant office buildings, which likely do not represent the same highest and best use as the subject property. Under the sales approach, they considered sales from the Portland area, which is a superior market to Eugene-Springfield. Under the income approach, Defendant's appraisers relied almost entirely upon asking rents, considering only one actual lease. They used both triple net and full service lease rates without making any

---

[8] The court previously excluded Defendant's cost approach from consideration.

adjustment for the different expense structures associated with those types of leases.  For those reasons, the court places no weight on Defendant's valuation conclusions.

B.      *Cost Approach*

"The cost approach relies on the cost of constructing a substitute property that provides the same utility as the subject property at its highest and best use."  *Hewlett-Packard*, 357 Or at 603.  "The cost approach is 'particularly useful in valuing new or nearly new improvements' " and "less useful where the evidence of cost is incomplete, distorted, or otherwise unreliable."  *Magno v. Dept. of Rev.*, 19 OTR 51, 55 (2006).

Chudzik used the replacement cost method to estimate the value of the subject property under the cost approach.  Before deducting for the various forms of depreciation, he concluded the replacement cost new of $26,246,221.  He calculated physical depreciation of $1,049,849, yielding a depreciated building value of $25,196,372.  Together with the stipulated land value, that indicates a real market value of $37,921,671 under the cost approach.  However, Chudzik also subtracted external obsolescence of $18,372,355, or 70 percent of the building replacement cost.  He determined that rate using the market extraction method.  Chudzik explained that a large deduction for external obsolescence was necessary because something about large, build-to-suit properties causes them to lose value quickly upon being built.

1.      *External obsolescence*

This court has described external obsolescence as "that ghostly apparition * * * [a] spirit whose presence may be discerned but whose intangible nature defies measurement, it confuses and chills the marketplace."  *Truitt Bros., Inc. v. Dept. of Rev.*, 10 OTR 111, 118 (1985).  Quoting *The Appraisal of Real Estate*, (8th ed 1983), the Oregon Supreme Court identified the two accepted methods for calculating external obsolescence:

> "An appraiser can use either of two methods to measure external obsolescence. The appraiser uses the method that is supported by the best market evidence. The two methods are (1) capitalizing the rent loss attributable to the negative influence [income capitalization approach], or (2) comparing sales of similar properties, some of which are subject to the negative influence and some that are not. If pertinent sales data are abundant, the second method is preferable to the first."

*Truitt Bros., Inc. v. Dept. of Rev.*, 302 Or 603, 611, 732 P2d 497 (1987) (internal quotation marks omitted). Citing that case, Defendant argued that Chudzik failed to utilize either of those two methods to measure external obsolescence. (Def's Closing Arguments at 7-8.)

The current edition of *The Appraisal of Real Estate* recognizes the market extraction method, but states that it yields a measurement of "total depreciation" and is used primarily "to establish total economic life expectancy." Appraisal Institute, *The Appraisal of Real Estate* 605 (14th ed 2013). In using the market extraction method, "[t]he comparable properties should ideally have physical, functional, and external characteristics similar to the subject property, and they should have incurred similar amounts and types of depreciation." *Id.* at 610. "When the comparable properties differ in design, quality, or construction, appraisers can find it difficult to judge whether differences in value are attributable to these characteristics or to a difference in age, and thus depreciation." *Id.* *The Appraisal of Real Estate* recommends use of actual age rather than effective age because effective age "age requires specific knowledge about the quality of construction and physical characteristics of the improvements" whereas actual age "is a fact that is readily available." *Id.* at 608-609.

2.  *Chudzik's market extraction calculation*

The court finds Chudzik's calculation of external obsolescence using the market extraction method unpersuasive. As noted above, the method measures total depreciation from all causes. Chudzik sought to account for that by subtracting his calculation of physical depreciation from each of his comparable sales. However, he used effective age rather than

actual age, resulting in some significant variation. For instance, Sale 1 was built in 1971, but he used an effective age of 18 years. At trial, Chudzik acknowledged that, if he had found any of his comparable sales suffered from functional obsolescence, it would have reduced the amount of depreciation attributable to external obsolescence. It is unclear how he determined that none of the comparable sales suffered from functional obsolescence, particularly given changes in the use of the comparable sales. For instance, Sale 4 formerly served as regional headquarters of Frontier Communication, but may have been in transition to a multi-tenant use. Significant differences in age and other characteristics of the properties results in a distorted and unreliable calculation of external obsolescence. The court is not persuaded by Chudzik's calculation and finds that the cost approach indicates a real market value of $37,921,671.

C.    *Sales Comparison Approach*

"[T]he sales comparison approach relies on sale prices of other properties that can serve the same highest and best use as the subject property." *Hewlett-Packard*, 357 Or at 603. "[O]nly actual market transactions of property comparable to the subject property, or adjusted to be comparable," may be used and all sales "must be verified to ensure they reflect arm's-length market transactions." OAR 150-308.0240(2)(c). To be comparable, properties should be "similar in size, quality, age and location" to the subject property. *Richardson v. Clackamas County Assessor*, TC-MD 020869D, WL 21263620 at *3 (Or Tax M Div Mar 26, 2003).

Upon consideration of Chudzik's comparable sales, the court finds that Sale 3 of the Allstate call center for $155 per square foot is the most comparable to the subject property. It is a LEED Silver call center built in 2011, which is reasonably similar to the subject property, a LEED Gold call center built in 2005. Several aspects of that sale indicate that the subject property would sell for more than $155 per square foot. Specifically, Sale 3 was in an inferior

location, of inferior quality, and sold during inferior market conditions. Chudzik concluded Sale 3 was a high indicator because it was leased to a high credit tenant. However, he acknowledged that Sale 3 was leased at market rent and that the sale of a leased fee at market rent is equivalent to the sale of a fee simple interest. The court is not persuaded that the creditworthiness of the Sale 3 tenant is significant to this analysis. Given the size of the subject property and the fact that it would compete in a regional or national market, the court assumes that any potential owner or lessee would possess adequate credit to purchase or lease the subject property.

Additional evidence submitted by Plaintiffs supports the conclusion that Sale 3 at $155 per square foot is a low indicator for the subject property. In his income approach, Chudzik relied on six "regional sales of larger offices" to develop a capitalization rate for the subject property. Only one of the six sales – Sale 4 of the former Frontier Communications headquarters – was also used in his sales comparison approach. Although he offered limited details about the other five sales, they indicated a price range of $144 per square foot to $169 per square foot. The three newest properties in the group – built in 2000 and 2001 – sold for $158, $167, and $169 per square foot.

With respect to the other sales considered by Chudzik, all of the properties were older than the subject property and none were LEED certified. Several of the sales involved deferred maintenance or plans to convert from single to multi-tenant use. For instance, the buyer of Sale 2 referenced plans to "renovate the buildings and re-tenant the property." (Ptfs' Ex 1 at 54.) Sale 4 had some deferred maintenance and needed a new roof, as well as "painting and general upgrading of finishes and landscaping." (*Id.* at 55.) The buyer of Sale 6 purchased the property with a plan "to re-tenant the building with most likely at least two tenants and anticipated demising the building for multi-tenant use." (*Id.* at 57.) The court is not persuaded that sales

anticipating a change from single to multi-tenant use represent the same highest and best use of the subject property. Chudzik's reliance on those sales caused him to understate the real market value of the subject property at its highest and best use as of January 1, 2015.

It is difficult to determine the subject property's likely sales price from the evidence presented. Assuming the subject property would sell for at least $170 per square foot indicates a real market value of $27,201,190 under the sales comparison approach.

D.     *Income Approach*

"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." *Allen v. Dept. of Rev.*, 17 OTR 248, 253 (2003). As with the other approaches to value, "[t]he income approach relies on the profits that the property can generate at its highest and best use." *Hewlett-Packard*, 357 Or at 603. The direct capitalization method "focuses on two key components: (1) the capitalization rate (cap rate) and (2) net operating income (NOI)." *Allen*, 17 OTR at 253.

In his income approach, Chudzik relied primarily on office leases from the Eugene-Springfield market. Those properties are all significantly smaller than the subject property, with the largest being 60,680 square feet. Chudzik explained that he relied on the local office market because a property's lease market may be smaller than its sales market. He did not provide any evidence to support that contention. Moreover, the court is concerned that the properties that Chudzik relied upon in his income approach would not serve as adequate substitutes for the subject property.[9]

/ / /

---

[9] "The principle of substitution is fundamental to all three traditional approaches to value—sales comparison, cost, and income capitalization." *The Appraisal of Real Estate* at 31. "For an income-producing property, an equally desirable substitute might be an alternative investment property that produces equivalent investment returns with equivalent risk." *Id.*

Even if the court were to accept Chudzik's leases as sufficiently comparable to the subject property, the court is not persuaded by his conclusion that the subject property's lease would fall toward the low to middle end of the range. Although larger properties tend to lease for less per square foot, several aspects of the subject property support a lease range toward the upper end of the range; specifically, the subject property's quality, age, LEED certification, and superior market conditions as of January 1, 2015, compared with leases from 2012 and 2013. At a lease rate of $15 per square foot, the subject property's potential gross income is $2,400,105 and its NOI is $2,232,098, after subtracting Chudzik's vacancy and expense rates.

"A cap rate is generally calculated using market sales. Slight deviations in cap rates profoundly change the estimated value of a property, making the proper calculation of the rate of paramount importance." *Allen*, 17 OTR at 260. Chudzik selected a cap rate of 8 percent from a range of 7.1 to 9.5 percent.[10] Defendant's appraisers selected a cap rate of 7.5 percent. The court agrees with Defendant's appraisers that a lower cap rate of 7.5 percent is supported for the subject property given its age, quality, and LEED Gold certification. At a cap rate of 7.5 percent and a NOI of $2,232,098, the income approach indicates a real market value of $29,761,306.

E.      *Reconciliation*

The three approaches to value indicate that the subject property's real market value is in the range of $27.2 to $38 million, with the sales comparison and income approaches indicating a real market value at the lower end of the range, $27.2 to $30 million. Given that the subject property was approximately 10 years old as of January 1, 2015, the court would be inclined to give less weight to the cost approach. However, the court finds that the values indicated under the sales comparison and income approaches lack reliability because the comparable properties

---

[10] The high end of the range, 9.5 percent, was due to a sale of a 233,358-square foot property constructed in 1957. (Ptfs' Ex 1 at 71.) The next highest cap rate was 8.4 percent. (*See id.*)

used in each approach were overall inferior to the subject property. Nevertheless, a real market value somewhat less than $40 million is supported by the evidence. The court finds that the subject property's real market value was $35 million as of January 1, 2015.

### III. CONCLUSION

Upon careful consideration, the court concludes that the subject property's real market value was $35 million as of January 1, 2015. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2015-16 real market value of property identified as Account 1082344 was $35 million.[11]

Dated this ____ day of May 2017.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was filed and entered on May 31, 2017.*

---

[11] The court may only order a change to the property tax roll if Plaintiffs are aggrieved. ORS 305.275(1)(a). The parties are instructed to notify the court in writing whether a reduction in the subject property's 2015-16 real market value to $35 million would result in tax savings to Plaintiffs.