148 March 4, 2013 No. 21

IN THE OREGON TAX COURT
REGULAR DIVISION

DEPARTMENT OF REVENUE
and Tillamook County Assessor,
*Plaintiffs,*

*v.*

SAHHALI SOUTH, LLC,
*Defendant.*

(TC 4994)

Plaintiffs (the department) appealed from a Magistrate Division decision as to the real market value (RMV) of lots in Tillamook County. Following trial, the court found that the valuation approach of the department's appraiser, albeit with minor flaws, was far superior to the analysis of the appraiser for taxpayer who did not undertake a full highest and best use analysis, and that the RMV of the property at issue should be as determined by the department, less certain subdivision costs accounted for by a risk discount of 25 percent.

Trial was held December 15 and 16, 2011, in the courtroom of the Oregon Tax Court, Salem.

Douglas M. Adair, Senior Assistant Attorney General, Department of Justice, Salem, argued the cause for Plaintiffs (the department).

Rohn M. Roberts, Arnold Gallagher, et al., Eugene, argued the cause for Defendant (taxpayer).

Decision rendered March 4, 2013.

**HENRY C. BREITHAUPT, Judge.**

## I. INTRODUCTION

This property tax case is before the court after trial. The tax year is 2008-09. The property involved in the case comprises 36 townhome lots, and two larger undivided lots, all on the Oregon coast just north of the town of Neskowin. In the Magistrate Division a decision was entered in favor of Defendant (taxpayer). Plaintiffs (collectively referred to as the department) have appealed from the decision of the magistrate. The parties have stipulated as to the value of eight detached home lots that had been at issue in the Magistrate Division.

## II.   FACTS

Reference is made to the decision of the magistrate for background facts about which there is no disagreement. The subject properties are all part of a development of single family house—or detached—lots and townhome lots. The properties, by all accounts, generally have view and location features of very high to superior quality.

The townhome lots are smaller than the detached home lots in the development. Lot size could be smaller given a common and completed septic system that did not require additional lot area for individual septic systems. The lots are located on a sloping bluff generally within 1000 feet of the ocean. Between the development and the ocean is a federally protected wetland through which one can walk to the ocean. Protections of the wetland insure that there will not be development of the land between the development and the ocean.

The project lots have high quality streets, curbs and storm drains and have all underground utilities. The townhome lots, while separate, are part of a development plan that calls for construction of one townhome immediately adjacent to its neighbor. This feature means that the lots will be developed only when the "sister" lot is also developed with a completed townhome structure. These townhome features result in townhome lots often, but not always, being sold to developers or builders who market lots with completed structures when they have purchasers for both parts of a pair of lots.

Taxpayer developed the lots in the context of an agreement with Butterfield Homes, Inc. (Butterfield), an unrelated company in the business of building and marketing completed townhome packages consisting of land and the townhome improvement. The parties, or affiliates, had also cooperated in the development, construction and sale of completed townhomes in a project, Sahhali Shores, located adjacent, but across Highway 101, from the subject properties.

As the Sahhali Shores project was coming to completion in 2005, taxpayer negotiated with Butterfield an

exclusive Option Agreement (the Option), pursuant to which—subject to certain conditions and over a 43-month period of time—Butterfield could purchase lots, improve those lots with townhomes and sell the resulting package of land and improvement. Taxpayer did not invite bids from or negotiate with other builders with respect to the purchase of lots, completion of townhomes and marketing of the land and completed townhomes. The prices under the Option varied according to the location of lots, and were composed of a base price and an amount equal to 2 percent of the sale price of the completed package of lot and townhome.

In May of 2006 the parties negotiated increases in base price for purchases by Butterfield under the Option. This occurred in connection with additional development costs incurred by taxpayer in connection with construction of highway turn lanes required by government authorities. The additional highway construction requirements also resulted in a delay in the ability of Butterfield to complete sales. This delay caused a loss of sales as potential purchasers went to other projects or, as the overall market began to change, decided not to complete a purchase. The loss of sales also resulted in Butterfield falling behind on minimum sales or "takedown" obligations under the Option. Taxpayer did not, however, seek to cancel or renegotiate the terms of the Option.

In addition to the townhome lots, two other lots are at issue in this case. They are lots 13 and 48. Those lots were initially platted and approved as single family residence lots. Subdivision of those lots was legally possible as of January 1, 2008. Indeed, one of the lots was subdivided in 2009.

### III.   ISSUE

The issue in this case is the real market value (RMV), as of January 1, 2008, of the lots at issue in this case.

### IV.   ANALYSIS

There are three main points of disagreement between the parties in this case. The first is the significance, if any, of the Option, and the prices thereunder, in

application of the comparable sales indicator of value.[1] The second disagreement is as to the comparable sales chosen by the respective appraisers for the parties. Finally, the parties disagree as to the highest and best use of lots 13 and 48. Taxpayer's appraiser took the position that the highest and best use of the lots was for sale without subdivision of the lots. The department's appraiser took the position that the highest and best use of the lots was subdivision and sale.

## A.  *The Option*

Taxpayer maintains that the prices Butterfield was required to pay for townhome lots upon exercise of the Option are a very good indicator of the value of a lot on January 1, 2008—an indicator so good that the concluded value as of the assessment date is very close to the Option price, taking into account some element for the additional price attributable to taxpayer's share of ultimate sales price. The department, for various reasons, objects to consideration of the prices set under the Option as evidence of RMV as of the assessment date.

Taxpayer stresses that the Option was negotiated between two unrelated parties, each of whom had every incentive to maximize its economic return flowing from the Option. That appears to be true. However, those features of a comparable sale—that is, unrelated parties acting without compulsion—are not enough to satisfy the criteria of a comparable sale for use in the proof of RMV. They do not overcome the fact that what the parties negotiated was not a sale at all, but rather the grant to Butterfield of rights to buy which, *if exercised*, would create an obligation of taxpayer to sell.

The rights of Butterfield extended over a significant time—43 months. That fact together with the exclusive rights of Butterfield and the pricing arrangement under the Option show that the Option cannot be relied upon to provide a valid sale for appraisal at any given point in time. Whatever market forces and realities led to the establishment of the

---

[1] Both parties agree that the comparable sales indicator of value is the proper indicator on which to rely in determining RMV for the property at issue in this case.

pricing provisions of the Option, they could not prevent market realities from changing such that sales completed under the Option in no way necessarily reflected market realities at the time of exercise of the Option. If prices for individual lots escalated after the Option was signed, the price paid by Butterfield would not be RMV as defined in ORS 308.205.[2] Rather the RMV would be a combination of the Option price and the economic value of the Option to Butterfield.[3] Indeed, if the market for townhome lots declined, it would also be true that the Option price would not indicate the RMV either. Of course the option holder would most likely not exercise the Option in such a case. But that economically rational act does not supply a price in a transaction in the market. It only indicates that the Option price is, in fact, not the RMV of the property.

The usefulness of the comparable sales indicator of RMV is that where a comparable property is involved, the binding decisions of a buyer and a seller provide evidence of value far superior to the other indicators of value and, as in this case, the only real evidence of value. Buyers and sellers are not committed to a possibility; they are committed to an actual transaction.

The department argues that the Option also had features of a bulk sale. To the extent that is the case, Oregon law is clear that the prices agreed upon by taxpayer and Butterfield would not be good evidence of RMV. *See, e.g.*, *Mathias v. Dept. of Rev.*, 312 Or 50, 817 P2d 272 (1991). Taxpayer correctly argues that the transaction under the Option was not in fact a bulk sale. However, it was a bulk option to purchase and, as such, has some of the troublesome elements of a bulk sale. Most notably, the Option applied to

---

[2] There is evidence from both parties that the market was rising between the time the Option was entered into and the assessment date, although the increase in prices and values had leveled off as of the assessment date. All references to the Oregon Revised Statutes (ORS) are to the 2007 edition.

[3] There is a provision in the Option for an additional increment of price to be paid by Butterfield. This is two percent of final sales price of the lot and townhome to the ultimate purchaser. There was no showing at trial as to whether, or to what extent, such a price increment caused sale prices to be below, at or even above general market values. In this regard, as in so many regards in taxpayer's proof, what the option prices showed was what the option prices were. That is simply not enough.

all the townhome lots and had a term that contemplated the complete build out of the townhome project. There was also only one possible purchaser under this exclusive arrangement—an arrangement entered into without any effort by taxpayer to entertain proposals from other builders or developers. Although it is not clear what all the considerations of the parties were in negotiating the Option, the record demonstrates that both sides of the agreement were interested in having a rapid build out and sale of the townhomes. Indeed, that goal appears to have also influenced taxpayer in choosing one option party for all the lots and to have that option party be a builder who would also undertake marketing and sales efforts.

The court does not question the good faith of the witnesses who explained these considerations that motivated the option parties. However, as with a bulk sale of lots, this bulk option of lots accommodates the business goals of only these particular parties. The transaction does not supply good evidence of whether or at what price others, or even these parties, would have sold and bought lots individually on or about January 1, 2008. And third party offers or interest in buying lots from taxpayer was effectively barred by the existence of the Option.

For these reasons, the court gives little to no weight to the prices of sales of lots under the Option.

B.  *Comparable Sales*

The views of the parties about the extent to which the Option provides market evidence also affects the approach the appraisers for each party took to finding and analyzing an overall group of comparable sales. Taxpayer's appraiser relied on a number of sales that had occurred under the Option and took the sales prices paid by Butterfield as evidence of the market value of lots as of January 1, 2008. For the reasons stated above, the court cannot agree with this analytical step of taxpayer's appraiser.

The appraiser for taxpayer also identified several lot sales at other locations and used the results of those sales to support his conclusion of value. However, in this step of his analysis, the testimony of the appraiser for taxpayer

indicates that he committed one of the most fundamental errors in reasoning—he assumed as his major premise his own conclusion as to value. His testimony indicates that he first took the Option sales as evidence of value. He then located lot sales, in fact far distant from the subject property and in no way comparable to the subject property, as to location and view amenities. He testified, however, that they were comparable to the subject because they were in the same price range as he had concluded applied to the subject lots—based on his reliance on the Option sales.

The non-subject sales upon which the appraiser for taxpayer relied were, in fact, not comparable to the subject. First, they were located at some distance from the subject. Second, many, if not most of them had decidedly inferior view characteristics. Indeed, many had no ocean view whatsoever whereas the main attraction of the subject lots is the good to extremely good ocean views available. Similarly, the purported comparables were at significant distances from the ocean. The evidence indicates that distance from the ocean is the other feature that makes the subject lots very attractive.

Based both on the logical error of the appraiser for taxpayer and the court's own evaluation of the supposedly comparable non-subject sales, the court places no weight on the opinion of the appraiser for taxpayer as to the comparables he employed in the comparable sales indicator of RMV.

The appraiser for the department also used only the comparable sales indicator in determining RMV. Many of the comparables used by this expert were sales that had been analyzed by the appraiser for taxpayer. However, those sales were apparently used by the appraiser for the department but discounted or not relied upon by the appraiser for taxpayer. In this category one sale stands out. It was a sale of a townhome lot located near the subject property. The sale was of the lot alone and apparently made to the end user. The date of the sale, June 26, 2008, was reasonably close to the assessment date. The property sold had very good view and location amenities. The sale price was $375,000, consistent with the conclusion of the appraiser for the department as to the subject property. However, the appraiser for taxpayer

did not rely on this sale and did not have a good reason for not doing so, other than, apparently, that the value was out of line with the Option prices.

Some of the sales relied upon by the appraiser for the department are after the assessment date and, in some cases, significantly so. However, the appraiser for the department analyzed the trending of sales prices during the post-assessment date period and concluded that the market for lots on the coast was relatively stable during this period. Post-assessment date sales may be used when it is shown that markets have not moved significantly during the post-assessment period. *Ernst Brothers Corp. v. Dept. of Rev.*, 320 Or 294, 305, 882 P2d 591 (1994). The appraiser for taxpayer questioned the reliance by the department on these sales, arguing that the market was declining during the relevant period and not stable. To support this point, the appraiser for taxpayer used sales trends for all types of property in all areas of three counties. That data source significantly weakens the criticism leveled by appraiser for taxpayer. This is so because the property in question here is prime ocean front property, not the general census of residential lots or improved properties in a county. The court concludes that the sales data used by the appraiser for the department from periods after the assessment date is reliable.[4]

In testing the reasonableness of their conclusions as to lot value, each appraiser undertook some form of "lot residual" analysis. This involved taking the ultimate sale of a lot and townhome "package" and then multiplying that by a developed lot to total ratio in order to extract the contribution to ultimate value of the lot. The department's appraiser located developments, other than the subject development, where lots sales occurred and later, sales of land and improvement occurred. The appraiser compared the lot sale price to the finished "package" price and developed a lot to "package" ratio of approximately 40 percent. Using approximately that figure and the asking prices for the lots that

---

[4] In any case, even if the criticism of the appraiser for taxpayer were well taken, the downward trend of the market after the assessment date would not support a conclusion that the sales could not be used. They would, at most, provide evidence of an RMV below that for which the department contends.

remained unsold, the appraiser for the department showed that the residual method supported his values determined under the comparable sales approach.

The appraiser for taxpayer once again allowed the Option to dominate his analysis. In developing a residual approach value, he looked only at sales that occurred at the subject development. He then compared the Option price to the final sales price of the "package" and calculated that the lot to "package" ratio was approximately 25 percent. Multiplying that percentage by the actual sales of the completed "packages" that had occurred, the appraiser, not surprisingly, showed that the ratio of lot to "package" values was 25 percent. Of course, all this analysis proved was that the ratio for this set of sales was the ratio for this set of sales. The appraiser for taxpayer did not seek out external sales or determine if his ratio was supported by market evidence from other comparable developments.

The test of reasonableness used by the appraiser for the department is not totally free of criticism, mainly because the lot sales were on lots different from those underlying the "package" sales used in the analysis. However, the department's appraiser did review the comparability of lots involved in the analysis and concluded that they were similar.

The approach of the department's appraiser, whatever its minor flaw, is far superior to the analysis of the appraiser for taxpayer. That appraiser again started from the proposition that the prices under the Option were RMV and having assumed the correctness of that point proceeded to "prove" that it was true. The failure of that appraiser to develop any market evidence from other sales or developments renders his approach unreliable.

The court concludes that the department has borne its burden of proof that the lot values for the townhome lots, other than lots 13 and 48, are as it maintains.

C.   *Highest and Best Use and Valuation of Lots 13 and 48*

These two lots were not subject to the Option and, as originally platted, were significantly larger than the townhome lots. There was testimony from the developer

that concern for initial plat approval motivated the developer not to include these lots sites for location of two townhomes. However, in 2009, these lots were, in fact, subdivided.

The parties differ as to the initial appraisal question of the highest and best use of these lots. The department takes the position that subdivision of the lots produced the highest value, and was legally possible. Taxpayer takes the position that approval of any subdivision application was subject to the risk of no approval being granted. The department values these lots at the rate applicable for the view and location characteristics they have, minus an allowance for the costs of subdivision. Taxpayer does not take into account any subdivision but adjusted the value of the lots upward from others in order to take into account the greater size of the lots. The testimony of the appraiser for taxpayer indicates he apparently did not undertake a full highest and best use analysis.

The court is of the opinion that the highest and best use of these lots was subdivision, as in fact occurred shortly after the assessment date. However, the court also views the department's valuation methodology as incorrect insofar as it does not provide a discount for the risk of land use approvals. While the subdivision of the lots was legally possible, approval was not a certainty. The difficulties that this development had with government approvals, especially in connection with highway access, demonstrate the risks that approvals present.

## V.   CONCLUSION

Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' value for each lot, less the subdivision costs with which the department agrees, is an appropriate base. The value of the lots should then be further reduced by a risk discount of 25 percent.