IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| STEPHEN J. HARDER and CYNTHIA A. HARDER, | ) ) ) | |
| Plaintiffs, | ) ) | TC-MD 200126G (Control); 210093G |
| v. | ) ) | |
| DESCHUTES COUNTY ASSESSOR, | ) ) | |
| Defendant. | ) | **DECISION** |

This is a real market value appeal of a vacant residential lot within the Pronghorn Resort. The tax years at issue are 2019–20 and 2020–21. At trial, Plaintiffs were represented by William Murphy, attorney-at-law, and Defendant was represented by Adam Smith, Deschutes County Assistant Legal Counsel. Plaintiffs' witnesses were the subject's owner, Plaintiff Stephen Harder, and a certified appraiser, Patrick Solitz. Defendant's witness was its registered appraiser, Chris Baldwin. Plaintiffs' Exhibits 1 to 8 and Defendant's Exhibits A to L were admitted.

At the close of Plaintiffs' case-in-chief, Defendant moved to dismiss Plaintiffs' 2019–20 claim, and the court denied Defendant's motion.

## I. STATEMENT OF FACTS

A.    *The Pronghorn Resort and Club*

The subject is a 0.47-acre vacant lot in a gated community at the Pronghorn Resort. (Ex A at 8.) Pronghorn is a high-end golf resort between Bend and Redmond with panoramic mountain views and numerous amenities, such as swimming pools, ball courts, and a 54,000-square-foot clubhouse with a fitness center, restaurants, lounges, a general store, and a spa. (*Id*. at 4–6; Ex 2 at 6.) Above all else, Pronghorn has two excellent golf courses, one designed by

Jack Nicklaus and the other by Tom Fazio. (Ex A at 4–5.) The Nicklaus course is open to the general public. (*Id*. at 8.) The Fazio course is open only to members of The Club at Pronghorn and to members of the public who buy reservations from club members. (*Id*.)

Membership in Pronghorn's club is restricted to owners of resort lots, for whom it is mandatory. (Ex A at 9; Ex 2 at 6.) As of the years at issue, new owners must pay either a $75,000 nonrefundable membership fee or a $115,000 membership deposit that is refundable upon resale of the lot at fair market value.[1] (Ex B at 1.) Thereafter, the owners must pay monthly membership fees of either $1100 (for use of all facilities and the golf courses) or $500 (for use of the facilities only), plus monthly homeowner association fees of $200. (Ex 2 at 6.)

When a Pronghorn lot is sold, the seller's membership deposit is handled according to the seller's instructions. (Ex B at 1.) A seller may receive a refund up to the amount of the whole deposit. A seller may also transfer all or part of the deposit to the buyer. In the latter case, the buyer would be responsible for bringing up the total amount of the deposit to $115,000. In some cases, the seller and buyer have agreed to transfer the deposit outside of escrow. (*E.g.*, Ex F at 1.) Because every deal is different and because deposit amounts vary by time of original purchase, obtaining information needed to compare sales can be difficult.

B.      *Subject History*

Due to a settlement agreement, the subject was excepted from the club membership requirement during Plaintiff's ownership. Plaintiffs bought the subject in 2003 or 2004 for $465,050 and paid a membership fee deposit. (Exs 2 at 4; 3 at 1; K at 3.) In 2012, Plaintiffs settled a dispute with the operator of the golf club whereby Plaintiffs waived their deposit and

---

[1] The amount of the membership deposit increased several times between 2003 and 2008, and has remained constant at $115,000 since 2008. (Ex A at 9.)

were released from the obligation to pay monthly membership dues. (Ex K at 2–5.) Any subsequent purchaser of the subject from Plaintiffs would be required to join the club and pay deposit and dues.

Plaintiffs sold the subject to an unrelated third party for $30,000 in a transaction that closed in April 2021. (Ex 8.) They had listed the subject at $50,000 in November 2019, then reduced their asking price to $30,000 in February 2020 and $25,000 in October 2020 after failing to generate any inquiries. (Ex 3 at 1–2.) In December 2020, they received an offer to buy the property for $25,000; they negotiated that price upward in exchange for allowing the buyer additional time to raise money for the membership deposit. (*Id*.)

C.    *Appraisals*

1.    *Plaintiffs' Appraisal*

Plaintiffs' appraiser, Solitz, concluded that as of May 8, 2020, the subject was worse than worthless—that it had a value of negative $40,000, meaning that a potential transferee would require a payment of $40,000 before accepting title. (Ex 2 at 2.) He analyzed four sales of lots fronting the Nicklaus golf course in the eastern portion of Pronghorn, with prices ranging from $10,000 to $65,000. (*Id*. at 2–3.) In each transaction the seller transferred a $115,000 membership fee deposit to the buyer. (*Id*.) Solitz adjusted each of the sales downward by the amount of the transferred membership fee, resulting in negative values for each comparable. (*Id*.) He made no other adjustments.

2.    *Defendant's Appraisal*

a.    Membership Fee Deposits

Baldwin did not adjust his chosen comparables for the transfer of a membership fee deposit. Formerly, Defendant had applied the same method as Solitz and subtracted the amount

of any transferred membership deposit from a lot's purchase price. Baldwin testified that Defendant reexamined that practice once it began yielding negative values for lots.

Baldwin reasoned that a seller's "net profit" differs from a lot's market value because of the "symbiotic" relationship between club membership and property ownership at Pronghorn, with membership being "non-severable" and "part of the bundle of rights for Pronghorn property owners." (Ex A at 9–12.) Because membership by the new owner is a condition of selling a Pronghorn lot, Baldwin argued it is not clear how much value should be allocated to the lot as opposed to the membership without knowledge of the intentions of the parties to the transaction. (*Id*. at 10.) For example, a given purchaser might have no intention of using the Pronghorn facilities and therefore might value only the lot; another might have no intention of building a home and might value only the opportunity to join the golf club.

Baldwin finds it "conceivable" that a Pronghorn lot being sold without a membership credit or transfer is less marketable. (Ex A at 10.) According to Baldwin, 13 out of the last 15 vacant lot sales in Pronghorn included full or partial membership credit. (*Id*. at 11.) Baldwin wrote: "When a lot is sold without a membership credit and the market expects it, the seller's lot is at a disadvantage; this burden is much clearer when you see the low sales prices on lot sales without a membership included." (*Id*.)

Because of the above concerns about the nonseverability of membership, lack of data for allocating value, and the marketability of a lot without a deposit transfer, as well as "little communication between [Defendant's] office and Pronghorn Resort," Baldwin placed "more weight" on "recorded sales prices rather than net sales prices after deducting the membership." (Ex A at 11–12.)

/ / /

b.      Market Analysis

Baldwin provided charts showing historical market data, including countywide median sales prices of vacant land since January 2016. (Ex A at 14–17.) Baldwin commented: "Despite the trend of an increasing median sales price, Pronghorn is the only resort community in Deschutes County that had vacant lots decline in median sales price." (*Id*. at 14.)

Pronghorn had a surplus of vacant lots throughout the years at issue. (Ex A at 15.) As of January 1, 2019, it had a 30-month supply; as of January 1, 2020, it had more than a 40-month supply. (*Id*.) Average days on market steeply increased in 2017 and 2018, reaching 200 days as of January 1, 2019, and almost 300 days as of January 1, 2020. (*Id*. at 16.)

Median sale prices for Pronghorn lots reached a peak of about $250,000 in early 2017. (Ex A at 17.) From 2018 to 2021, they fluctuated around $125,000, dipping to about $75,000 (in late 2018 and mid-2020) and rising to about $150,000 (from mid-2019 to early 2020). (*Id*.)

c.      Comparable Sales

Analyzing sales data over multiple years, Baldwin concluded that lot sales from the western portion of Pronghorn tended to command a higher market price. (Ex A at 18–27.) He attributed that difference to a market preference for lots fronting the private Fazio golf course and for the superior mountain views available to the west. Baldwin also opined that the data showed "new signs of instability" throughout 2018 and 2019, with values of vacant lots generally declining. (*Id*. at 18, 24.) Nevertheless, Baldwin concluded that the subject's real market value remained constant from 2019–20 to 2020–21. (*Id*. at 27.)

Baldwin identified six 2018 comparable vacant lot sales, four of which were bank sales to Pronghorn management for less than $20,000, without any transfer of membership deposit. (Ex A at 23.) The other two were a $125,000 sale of a lot in the northwestern corner of Pronghorn

and a $127,500 sale of an eastern lot; the eastern sale included a $115,000 membership deposit transfer, while the northwest corner lot did not. (*Id*.) Baldwin identified the northwest corner lot as most comparable to the subject because, like the subject, it was located on a cul-de-sac and offered second-story mountain views. (*Id*. at 24–25.) It sold in April 2018.

Baldwin identified nine 2019 comparable vacant lot sales. (Ex A at 26.) One was a private transaction in which a lot was sold back to Pronghorn for $5,000 so that the owner could "get out of paying membership dues and walk from the property"; another was given less weight as "a resort group sale." (*Id*. at 27.) Three more were sales from $65,000 to $85,000 that included transfer of the $115,000 membership fee deposit. (*Id*. at 26.) All three of those were eastern lots with limited views, as was another that sold for $135,000 with a $115,000 membership fee deposit transfer. (*Id*. at 27.) Two more sales were of "premium" lots that were given less weight. (*Id*.) The final lot sale is the one Baldwin identified as most comparable to the subject. It was the only sale in the same section of Pronghorn as the subject, located just eight lots away. (*Id*.) It sold for $168,500 in May 2019 in a transaction that included a $115,000 membership fee transfer. (*Id*. at 26.)

In his reconciliation, Baldwin gave most weight to the 2018 sale in the northwest corner because it did not involve a membership fee transfer. (Ex A at 24–25.) He found support for carrying that value forward to 2020–21 in the 2019 sale of the lot near the subject. (*Id*. at 27.) Ultimately, his conclusion was that the subject's value was $125,000 as of both January 1, 2019, and January 1, 2020. (*Id*. at 1.)

### d. Improved Property Ratio and Extraction

Baldwin sought to corroborate his sales comparison approach by extracting the land value from a pair of similar improved property sales in Pronghorn. (Ex A at 28–30.) He analyzed the

tax accounts of 21 improved property sales across five Central Oregon resorts and determined that the "average land to sales price ratio in Central Oregon resort communities is 19% to 24%, significantly higher than the 11% ratio in Pronghorn." (*Id*. at 29.) He multiplied the time-trended sale prices of the two Pronghorn homes by 19 percent and concluded that the result indicated land values of $192,280 and $215,688. (*Id*. at 30.) Baldwin interpreted those results as showing that his $125,000 valuation of the subject was at low end of a range extending up to a possible value of $216,000. (*Id*.)

## II. ANALYSIS

At issue are the real market values of the subject property on January 1, 2019, and January 1, 2020. As the parties seeking affirmative relief, Plaintiffs must bear the burden of proof. *See* ORS 305.427.[2]

Real market value is defined as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1). Real market value is determined by methods and procedures that accord with rules adopted by the Department of Revenue, including the sales comparison approach, cost approach, and income approach. ORS 308.205(2); OAR 150-308-0240(2)(a).[3]

Here, both parties' appraisers developed the sales comparison approach. Only market transactions of properties "comparable to the subject, or adjusted to be comparable" may be used in such an approach. OAR 150-308-240(2)(c). Where nontypical market conditions are involved in a transaction, that transaction may only be used if market-based adjustments are

---

[2] The court's references to the Oregon Revised Statutes (ORS) are to 2019. The relevant statutes are unchanged from 2017.

[3] Oregon Administrative Rules (OAR)

possible. *Id*. An important subissue of this case is the proper adjustment for transactions that include the transfer of a membership fee deposit.

A.     *Adjustment for Transfer of Membership Fee Deposit*

The membership fee deposit creates a nontypical market condition among Pronghorn lots. Therefore, a market-based adjustment for the deposit is necessary if sales comparables from Pronghorn are to be used. *See* OAR 150-308-240(2)(c).

The method of adjusting for a membership fee deposit by deducting it from the sale price—employed here by Solitz—was employed by both parties in *Tetherow Golf Course v. Deschutes County Assessor*, 20 OTR 554, 565 (Or Tax 2012). The court in that case determined that sale prices from which membership fees were deducted were the "proper starting point in valuing the lots" and proceeded to make a further adjustment based on one party's "marginally better comparables." *Tetherow*, 20 OTR at 565. Nevertheless, the court's acceptance of that adjustment in *Tetherow* does not determine the result here. To the extent the proper method of valuation is not prescribed by law or regulation, it is evaluated anew in every case from "testimony of witnesses and exhibits properly admitted." *Bylund v. Dept. of Rev.*, 292 Or 582, 585–86, 641 P2d 577 (1982); *Powell St. I LLC v. Multnomah Cty. Assessor*, 22 OTR 423, 430 (Or Tax 2017), *aff'd*, 365 Or 245, 445 P3d 297 (2019).

Deducting the membership fee deposit from the sale price makes sense where a lot is sold for more than the amount of any deposit transferred. Under those circumstances, the deposit is a cash equivalent to the seller. For example, if a sale concludes for $215,000, with the seller transferring a $115,000 membership deposit to the buyer, each party has "netted" $100,000 on the real property. The buyer has paid $215,000, but received a membership worth $115,000; the seller has received $215,000, but given up a $115,000 deposit that could have been refunded. It

could "reasonably be expected" that parties agreeable to such a transaction would, all else being equal, just as willingly consent to a sale for $100,000 without a deposit transfer. *See* ORS 308.205(1). In that case, the buyer would still be out of pocket $215,000 after paying the membership fee to Pronghorn on top of the purchase price and the seller would still walk away with $215,000 after collecting the buyer's payment and the deposit refund. Because a $100,000 sale without a transfer is equivalent to a $215,000 sale with a transfer, adjusting for the transfer is a matter of subtracting the amount of the transfer from the sale price.

In the above example, concerns about parties' private intentions are beside the point. Because economically identical transactions can be structured either with or without a deposit transfer, an adjustment can be made based only on the sale price and the amount transferred.

Where the membership fee deposit transfer exceeds the sale price—*e.g.*, a $65,000 sale price with a $115,000 deposit transfer—a difficulty arises. The full deposit is no longer a cash equivalent to the seller, and the transaction cannot be restructured so that the seller gets the full deposit and the buyer pays a smaller price. Under those circumstances, either the lot has a negative value, or the seller is giving the buyer a discount on the value of the membership fee.

Of those alternatives, the latter is more probable. The evidence indicates Pronghorn lots are not worthless. Pronghorn has bought several lots without membership deposits from banks over the past few years, paying approximately $10,000 to $15,000 in 2018. Other lots have sold to other buyers, including the subject of this appeal, which was purchased for $30,000 in 2021. The fee deposit, on the other hand, is a sunk cost that cannot be recouped by a property owner without a sale. To an owner who wants out—and the evidence indicates some owners did want out, given the high carrying costs—the deposit has no cash value until a sale is made. In a

///

buyers' market, it may make sense for a seller to take "half a loaf rather than none" by transferring the deposit for a smaller price.

In a transaction in which the membership deposit is transferred at a discount, the sale price does not necessarily reveal the lot's value; it is possible that some portion of the sale price should be allocated to the membership deposit. That potential allocation difficulty arises only where the transferred deposit exceeds the purchase price. Where the purchase price exceeds the transferred deposit, an adjustment can be made by subtracting the latter from the former, as was done by the parties in *Tetherow*.

In the present case, sales without a deposit transfer and sales with a deposit transfer less than the sale price are potentially adjustable for use in the sales comparison approach. Those sales must be adjusted downward by the amount of the transferred deposit. Because no suitable method has been presented for adjusting comparable sales involving a deposit transfer larger than the sale price, such sales are excluded.[4] *See* OAR 150-308-240(2)(c).

B.      *Value of Subject*

Evidence of the subject's 2019–20 and 2020–21 real market values is found in the subject's 2021 sale and prior sales of other comparable lots.

A "recent" sale of a subject property can be "very persuasive" of market value if it is a voluntary, arm's-length transaction between knowledgeable parties. *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973); *Ernst Bros. Corp. v. Dept. of Rev.*, 320 Or 294, 300, 882 P2d 591 (1994). Whether a sale is sufficiently recent depends on "the similarity of conditions affecting value at the time of the transaction and conditions affecting value at the time of the

---

[4] The court does not hold that no adjustment is possible where the deposit transfer exceeds the sale price, but only that the evidence in this case does not show how it could be done.

assessment." *Sabin v. Dept. of Rev.*, 270 Or 422, 427–28, 528 P2d 69, 71 (1974) (holding that sale almost two years after assessment date was persuasive of market value where no evidence of change in market conditions).

In the present case, Defendant challenges whether the market conditions at the time of the sale in April 2021 sufficiently resembled the conditions on the January 1 assessment dates in 2019 and 2020. Defendant points to the fluctuating median sale prices of Pronghorn lots during 2018 and 2019, as shown on Baldwin's charts of historical data.

Those charts are of limited use in evaluating the state of the market during the relevant period. The charts report median sales price only. They do not record the total number of sales, the average sales prices, or the standard deviation from that average. Furthermore, they do not incorporate adjustments for membership fee deposit transfers. Against the obscurity of the charts is the conclusion of Defendant's own appraiser that the subject's value remained constant from 2018 to 2019. The evidence does not indicate significant market change over the relevant period, meaning the subject's April 2021 sale may be a helpful indicator of its value.

Over a year passed from when the subject was listed at $50,000 to when it went under contract in December 2020. Because Plaintiffs decreased the asking price only three months after listing, it is not clear that the subject was adequately exposed at $50,000. However, Plaintiffs' difficulty in selling the subject at even their reduced asking price strongly suggests the subject was not worth more than $50,000 in 2020.

Of the several sales comparables identified by the appraisers, the May 2019 sale of a lot in the same section of Pronghorn as the subject stands out. Baldwin identified that sale as the most comparable of 2019, and its proximity to the subject supports that conclusion. That lot sold for $168,500 with a $115,000 membership fee deposit transfer. Because the sale price exceeded

the deposit transfer, to be made comparable to the subject it should be adjusted by subtracting the full amount of the deposit. The $168,500 sale price minus the $115,000 membership deposit yields an adjusted sale price of $53,500.

The evidence does not contain any other sales comparables as close to the subject. All of Solitz's sales and several of Baldwin's are unusable because the deposit transfers exceeded the sale price, leaving the possibility of market-based adjustments an open question. *See* OAR 150-308-240(2)(c). Several more of Baldwin's involved bank sales of foreclosed properties, also subject to nontypical market conditions. The remainder involved properties from other sections of Pronghorn less directly comparable to the subject.

The most noteworthy of those other lots is the one in the northwest corner that sold in April 2018, identified by Baldwin as the most comparable sale of that year. That lot differs importantly from the subject in that it is set back from the road and borders the Fazio course on two sides, with nothing but undevelopable federal land for miles beyond. It appears more private than the subject and better situated to capture mountain views unimpeded by houses. The northwest corner lot's sale date before both assessment dates is not dispositive; comparable sales occurring after the assessment date are not barred from use in a retrospective appraisal. *Dept. of Rev. v. Sahhali South, LLC*, 21 OTR 148, 155 (2013). Indeed, the May 2019 sale of the other, nearer lot that Baldwin found most comparable in 2019 is closer in time to both the 2019 and 2020 assessment dates than the northwest corner lot's sale.

Baldwin's improved property ratio and extraction analysis "extracts" the land value from improved property sales in Pronghorn using a ratio of land to improvement value. That ratio is derived from the land and improvement values placed on the tax roll for various other Central Oregon resort property tax accounts. The reliability of that ratio is key to the reliability of the

analysis. However, no market evidence of those land and improvement values was provided. Instead, Baldwin's analysis requires the assumption that the tax roll values are correct. That is an assumption the court cannot make. In Oregon, there is no presumption that a value placed on the tax roll by the assessor is correct. *J. R. Widmer, Inc. v. Dept. of Rev.*, 261 Or 371, 377–78, 494 P2d 854 (1972). Without market evidence supporting the land and improvement values on the tax roll, the ratio derived from them and the extraction analysis are unsupported.

The two most important pieces of evidence of the subject's value are its own sale price, which shows its value did not exceed $50,000 in 2019, and the $53,500 adjusted sale price of the nearby lot. Given the lack of evidence of a change in market conditions, it is more probable than not that the subject's real market value was $50,000 on both the relevant assessment dates.

III.  CONCLUSION

The evidence shows that the subject, identified as Account Number 242461, is overvalued on the 2019–20 and 2020–21 tax rolls. Now, therefore,

IT IS THE DECISION OF THIS COURT that the subject's real market value for both 2019–20 and 2020–21 was $50,000.

Dated this ____ day of January 2022

_____
POUL F. LUNDGREN
MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.*

*Some appeal deadlines were extended in response to the Covid-19 emergency. Additional information is available at https://www.courts.oregon.gov/courts/tax*

*This document was signed by Magistrate Poul F. Lundgren and entered on January 31, 2022.*